UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANA LIMITED,

        Plaintiff,

                                     File No.  1:10-CV-450

v.

                                     HON. ROBERT HOLMES BELL

AMERICAN AXLE AND MANUFACTURING
HOLDINGS, INC., et al.,

        Defendants.

_____/

## O P I N I O N

This action involving the alleged theft of trade secrets is before the Court on Defendants' motions for summary judgment.  (Dkt. Nos. 196, 199.)  For the reasons that follow, the Individual Defendants' motion will be granted in part and denied in part, and American Axle's motion will be denied.

## I.

Plaintiff Dana Ltd. is a manufacturer of axles, driveshafts and chassis for the automotive industry.  Defendant Leo Wenstrup was employed by Dana and its predecessor, Eaton Corporation, at its facility in Kalamazoo, Michigan, for 30 years before his termination in April 2009 due to a reduction in force.  Defendants Gary Turner and Jacob Adleman were employed by Dana in its Advanced Engineering Group for Commercial Vehicles. Turner was a Product Engineering Manager, and Adleman was a Product Design Engineer.

In January 2010, Dana announced that it would be closing its Kalamazoo engineering operations, and consolidating its commercial vehicle engineering operations in Maumee, Ohio.

Defendant American Axle also manufactures axles, driveshafts and chassis, and is a direct competitor of Dana in the automotive manufacturing industry.   American Axle has a manufacturing facility in Three Rivers, Michigan.   The main focus of American Axle's business has been on components of passenger cars and light trucks.   However, since 2008, American Axle has begun expanding its commercial vehicle business unit which makes and sells axles for heavy duty trucks.

Wenstrup copied numerous Dana files onto his personal computer before leaving Dana and immediately after leaving Dana in April 2009.   Wenstrup admits accessing these files prior to beginning work for American Axle at its Three Rivers facility in February 2010. (Wenstrup Dep. 149-52.)   Turner and Adleman resigned from Dana on April 23 and April 26, 2010, respectively, to join American Axle.   After accepting employment with American Axle, but  prior to submitting their resignations at Dana, both Turner and Adleman copied numerous engineering information files off of their computers and took the information with them when they left Dana.

On May 11, 2010, Dana filed this action against American Axle, Turner and Adleman. Dana filed an amended complaint on April 7, 2011, adding Leo Wenstrup as a defendant. In its Amended Complaint, Dana alleges violation of the Computer Fraud and Abuse Act

2

("CFAA"), 18 U.S.C. § 1030 et seq., breach of contract, misappropriation of trade secrets, breach of fiduciary duty, unfair competition, and tortious interference. (Dkt. No. 73.) Dana also filed a motion for temporary restraining order. (Dkt. No. 4.) The Court entered a temporary restraining order enjoining Defendants from using Dana's confidential information, ordering Defendants to preserve all computers, and electronic storage devices that may contain Dana's confidential information, and ordering Defendants to account for and return all copies of Dana's confidential information. (Dkt. No. 5.) The parties entered into an agreed preliminary injunction with substantially the same terms, as well as an agreed protocol for examining computers and electronic storage devices. (Dkt. No. 24.)

## II.

The Federal Rules of Civil Procedure require the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If Defendant carries its burden of showing there is an absence of evidence to support a claim, Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In considering a motion for summary judgment, "the district court must construe the

evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas and Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)).  Nevertheless, the mere existence of a scintilla of evidence in support of  Plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff.  *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

## A.  Computer Fraud and Abuse Act, Count I

Count I of Plaintiff's amended complaint alleges violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.* against Defendants Turner and Adleman.[1] (Dkt. No. 73, Am. Compl.) The CFAA violations alleged in Count I require proof that Defendants accessed Dana's computers without authorization, or that they exceeded their authorized access.  The phrase "without authorization" is not defined in the CFAA.  The Sixth Circuit has held that under its plain meaning, one who accesses a computer "without authorization" does so without sanction or permission.  *Pulte Homes, Inc. v. Laborers' Intern. Union of N. Am.*, 648 F.3d 295, 304 (6th Cir. 2011).  Thus, "a person who uses a computer 'without authorization' has no rights, limited or otherwise, to access the computer

---

[1]Although the CFAA is primarily a criminal statute, it also permits "[a]ny person who suffers damage or loss by reason of a violation of this section [to] maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  18 U.S.C. § 1030(g).

in question." *Id*. (quoting *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009)). The CFAA defines "exceed authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

Defendants Turner and Adleman move for summary judgment on Count I because Dana's designated corporate witness, Mark Davis, confirmed that Turner and Adleman were authorized by Dana to access the computers and files they accessed prior to their resignation from Dana. (Davis Dep. at 25-27). Thus, they contend, Dana cannot prove the requisite element of access "without authorization" or in "excess of authorized access" as required by the CFAA.

Dana agrees that its CFAA claim requires proof that Turner and Adleman accessed Dana's computer systems either "without authorization" or that they "exceed[ed] authorized access." (Dkt. No. 245, Dana Br. 25.) Dana also agrees that Turner and Adleman had a right to access Dana computers and the files in question as part of their employment at Dana. Dana contends, however, that the minute Turner and Adleman accessed Dana's computer network and copied files for their own benefit or for the benefit of their new employer, they lost their authority to access Dana's computer system.

Both Plaintiff's and Defendants' interpretations of the CFAA are supported by case law. There is a split in legal authority as to whether the CFAA applies when an employee, who has been granted access to his employer's computers, uses that access for an improper purpose.

One line of authorities takes a broad view of the statute, holding that "an employee accesses a computer 'without authorization' whenever the employee, without the employer's knowledge, acquires an interest that is adverse to that of his employer or is guilty of a serious breach of loyalty." *Guest-Tek Interactive Entertainment, Inc. v. Pullen*, 665 F. Supp. 2d 42, 45 (D. Mass. 2009). *See, e.g.*, *United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010) (holding that Social Security Administration employee violated the CFAA when he accessed personal records for nonbusiness reasons in violation of SSA policy); *United States v. John*, 597 F.3d 263 (5th Cir. 2010) (holding that the CFAA encompasses limits placed on the use of information obtained by permitted access to a computer system "at least when the user knows or reasonably should know that he or she is not authorized to access a computer and information obtainable from that access in furtherance of or to perpetrate a crime"); *Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418, 420-21 (7th Cir. 2006) (holding that employee's breach of his duty of loyalty terminated his agency relationship with his employer, and with it his authority to access his employer's computer).

The other line of cases takes a narrow view of the statute, holding that the CFAA prohibits improper "access" of computer information, rather than misuse or misappropriation of such information. *See*, *e.g.*, *LVRC Holdings L.L.C. v. Brekka*, 581 F.3d 1127, (9th Cir. 2009) (noting that the plain language of the CFAA does not support the argument that authorization to use a computer ceases when an employee resolves to use the computer contrary to the employer's interest, and further noting that because the CFAA is a criminal

statute, any ambiguity must be resolved in favor of lenity); *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373, 385 (S.D.N.Y. 2010) ("The plain language of the CFAA supports a narrow reading. The CFAA expressly prohibits improper 'access' of computer information. It does not prohibit misuse or misappropriation."); *Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 962, 965-67 (D. Ariz. 2008) (holding that the plain language of the CFAA, its legislative history, and principles of statutory construction support a narrow reading of "authorization"); *Int'l Ass'n of Machinists & Aerospace Workers v. Werner–Masuda*, 390 F. Supp. 2d 479, 499 (D. Md. 2005) (holding that the CFAA does not proscribe "authorized access for unauthorized or illegitimate purposes").

The Sixth Circuit has not squarely addressed the meaning of "without authorization" or "exceeds authorized access" in the context of departing employees. However, the Sixth Circuit's opinion in *Pulte Homes*, 648 F.3d at 299, suggests that the Sixth Circuit would adopt the narrow view insofar as it relied heavily on the Ninth Circuit's opinion in *LVRC Holdings* for a definition of "without authorization." *Pulte Homes*, 648 F.3d at 304. A growing number of cases are adopting the narrow view. *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012) (citing cases). District courts within the Sixth Circuit are among them. *See*, *e.g.*, *Ajuba Intern., L.L.C. v. Saharia*, No. 11-12936, 2012 WL 1672713, at *11-12 (E.D. Mich. May 14, 2012) (adopting the narrow approach and holding that allegation that employee lost any authorization he had to access employer's computers, or, exceeded his authorization when he accessed the computers in violation of confidentiality and use

limitations, failed to state a claim under the CFAA); *ReMedPar, Inc. v. AllParts Med., L.L.C.*, 683 F. Supp. 2d 605, 609 (M.D. Tenn. 2010) (construing "without authorization" narrowly, and dismissing CFAA claim based on use of information the employee was authorized to obtain in a fashion that was adverse to the employer's interests); *Black & Decker (US), Inc. v. Smith*, 568 F. Supp. 2d 929, 933-36 (W.D. Tenn. 2008) (rejecting *Citrin*'s agency analysis, and dismissing CFAA claim that was based not on the employee's accessing of information, but on his later misuse thereof); *see also Am. Family Mut. Ins. Co. v. Rickman*, 554 F. Supp. 2d 766, 771 (N.D. Ohio 2008) (noting in dicta that the CFAA "was not meant to cover the disloyal employee who walks off with confidential information. Rather, the statutory purpose is to punish trespassers and hackers.").

The plain language of the CFAA concerns access to a computer rather than the motive for accessing the computer or the use of the information obtained. *See Black & Decker*, 568 F. Supp. 2d at 934-35; *see also LVRC Holdings*, 581 F.3d at 1135 ("The plain language of the statute therefore indicates that 'authorization' depends on actions taken by the employer. Nothing in the CFAA suggests that a defendant's liability for accessing a computer without authorization turns on whether the defendant breached a state law duty of loyalty to an employer."). Moreover, because the CFAA is primarily a criminal statute, the rule of lenity requires any ambiguity to be resolved in favor of the party accused of violating the law. *Black & Decker*, 568 F. Supp. 2d at 935. Federal criminal liability should not be based on every violation of a private computer use policy. *See Nosal*, 676 F.3d at 859 (noting that

criminalizing any unauthorized use of information obtained from a computer would make criminals of large groups of people who would have little reason to suspect they are committing a federal crime). Finally, the legislative history "supports the conclusion that Congress did not intend the CFAA to extend to situations where the access was technically authorized but the particular use of the information was not." *ReMedPar*, 683 F. Supp. 2d at 613 (citing *Black & Decker*, 568 F. Supp. 2d at 935-36). *See also*, *Nosal*, 676 F.3d at 858 n.5 ("[T]he legislative history of the CFAA discusses this anti-hacking purpose, and says nothing about exceeding authorized use of information . . . ."). These courts also noted that the broad interpretation "would require an analysis of an individual's subjective intent in accessing a computer system, whereas the text of the CFAA calls for only an objective analysis of whether an individual had sufficient 'authorization.'" *Ajuba*, 2012 WL 1672713, at *12 (quoting *United States v. Aleynikov*, 737 F. Supp. 2d 173, 193 (S.D.N.Y. 2010)). In addition, "an interpretation of the CFAA based upon agency principles would greatly expand the reach of the CFAA to any employee who accesses a company's computer system in a manner that is adverse to her employer's interests" and "would convert an ordinary violation of the duty of loyalty or of a confidentiality agreement into a federal offense." *Id.* (quoting *Aleynikov*, 737 F. Supp. 2d at 193).

This Court agrees with the rationale of the district courts in this circuit, and joins these courts in concluding that the terms "without authorization" and "exceeds authorized access" in the CFAA must be given a narrow meaning. Because there is no dispute that Dana gave

Turner and Adleman authority to access the files, Dana cannot establish that Turner and Adleman accessed the files without authorization for purposes of the CFAA.

Dana also contends that, even if Turner and Adleman had authority to access the files, they exceeded that authority when they deleted or overwrote the files.  The CFAA defines "exceeds authorized access" as "access[ing] a computer with authorization and . . . us[ing] such access to obtain or **alter** information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6) (emphasis added).  "Under the CFAA, 'any impairment to the integrity or availability of data, a program, a system, or information' qualifies as 'damage.'"  *Pulte Home*, 648 F.3d at 301 (citing 18 U.S.C. § 1030(e)(8)).

Dana does not allege that Turner or Adleman  damaged Dana's computers, software, or computer system.  Dana only alleges that Turner and Adleman deleted files.  Dana has presented evidence that Turner deleted 14 folders from his computer, and that Adleman deleted between 246 and 1,444 files from his computer.  (Pl. Exs. 37, 39.)  Dana has not attempted to show that Turner and Adleman lacked authority to delete files on their work computers.  Work computers were equipped with a software program to back-up copies of files and folders.  (Def. Ex. 4, Ripa Aff. ¶ 4.)  Even Dana's IT Policy specifically recognizes employees' authority and/or duty to delete or destroy any duplicate copies that are not returned to Dana.  (Pl. Ex. 81, IT Policy, p. 2.).  Furthermore, there is no suggestion that employees were prohibited from deleting personal information from their work computers.

Nevertheless, the unauthorized deletion of *original* files that damaged Dana would

undoubtedly fall within the scope of the CFAA.  *See Cheney v. IPD Analytics, L.L.C.*, No.

08-23188-CIV, 2009 WL 3806171, at *6 (S.D.  Fla. Aug. 20, 2009) (noting that permanent

deletion of files from a laptop computer without authorization may constitute "damage"

under CFAA, but that deletion of files alone does not constitute damage if the deleted data

is still available to the plaintiff through other means).

Turner and Adleman have denied deleting any original files.  Greg Andres and

Gregory Parent, the employees who continued the work of Turner and Adleman, testified

they had no difficulty accessing the files they needed to continue Adleman's work, and that

they were not aware of any original information that had been deleted.  (Def. Ex. 2, Andres

Dep. 11-19; Def. Ex. 3, Parent Dep. 10-20.)  Andres did have some difficulty following up

on Turner's projects, not because files were deleted, but because his computer was

confiscated, and Dana did not provide him with a copy of his hard drive.  (Andres Dep. 14-

15.)

Although Dana alleged deletion or overwriting of files when it filed this action in

May, 2010, Dana did not ask Rebecca Hendricks, its computer expert, to attempt to recover

the deleted files for over a year.  (Hendricks Dep. pp. 108-09.)  Dana never requested

Hendricks to compare the deleted files to the to the original Dana files which remained fully

available on Dana's department-wide engineering network.  (Hendricks Dep. at 150.)

Dana's corporate representative, Mark Davis, was not aware of any investigation by Dana

to determine if other copies of the Dana files deleted by Turner and Adleman remained on

Dana's engineering computer network.  (Davis Dep. 48- 49.)

Dana's argument that Turner and Adleman exceeded their authorized access to Dana files by destroying original files is based on nothing more than speculation. Dana has not presented any evidence that the deleted files were original files or that they included information of any importance to Dana that was not otherwise available. Dana contends that because the files were permanently destroyed, it cannot determine whether the files were duplicate files that were backed up on Dana's main computer, or whether they were original files. However, this contention, standing alone, is not sufficient to show that Dana was damaged in light of Dana's failure to attempt recovery of the deleted information in a timely manner, and its failure to provide evidence that any Dana engineering files significant enough to damage Dana were missing. Viewing the facts in the light most favorable to Dana, the Court concludes that no justifiable inference can be made that Turner and Adleman destroyed any original files of Dana.

Because Turner and Adleman were authorized to access the information in question, and because there is no evidence that they deleted any original Dana files, there is no showing that they accessed Dana's computers without authorization, or that they exceeded their authorized access in violation of the CFAA. Summary judgment will accordingly be entered in favor of Defendants Turner and Adleman on Dana's CFAA claim.

## B. Breach of Contract, Counts II, III & IV

Counts II, III, and IV of Dana's amended complaint allege breach of contract claims against Turner, Adleman and Wenstrup. Dana alleges that each of these individual

Defendants breached agreements with Dana by using and disclosing Dana's confidential information for their own benefit, by inevitably disclosing such information to American Axle, and by failing to return all of Dana's property. (Dkt. No. 73, Am. Compl. ¶¶ 125, 130, 135.)

Turner and Adleman move for summary judgment on the breach of contract claims against them. Wenstrup moves for partial summary judgment on only the inevitable disclosure portion of the breach of contract claim against him.

Although the complaint alleges inevitable disclosure in Counts II, III, and IV (the breach of contract counts) (Am. Compl. ¶¶ 125(a), 130(a), 135(a)), Dana states in its response brief that "[i]nevitable disclosure has nothing to do with a breach of contract claim," and that it "does not base its breach of contract claim on a theory of inevitable disclosure, but instead on the use and disclosure of Dana's confidential information in direct violation of the Individual Defendants' contractual obligations." (Dkt. No. 245, Dana Resp. Br. at 34 n.12.) "Statements of an attorney that are directly related to the litigation at hand have been held to be within the attorney's scope of authority and binding on the client." *United States v. Johnson*, 752 F.2d 206, 210-11 (6th Cir. 1985). *See also Berlin v. The Celotex Corp.*, No. 89-6016, 1990 WL 125360, at *2-3 (6th Cir. Aug. 29, 1990) (unpublished) (holding that counsel's remarks constituted a judicial admission, thus removing an issue from dispute, and relieving the opposing party from the responsibility of proving the issue at trial). The Court will proceed with the understanding that Dana has

withdrawn any claim of inevitable disclosure in conjunction with its breach of contract claims.

The individual defendants have not requested summary judgment on the breach of contract action against Wenstrup.  They acknowledge that there are issues of fact as to his alleged use and disclosure of Dana's confidential information.  Defendants Turner and Adleman, however, contend that they are entitled to summary judgment on the breach of contract claims against them.

The elements of a breach of contract claim under Michigan law are:  (1) the existence of a valid contract between the parties; (2) the terms of the contract; (3) defendant's breach of the contract; and (4) that the breach caused plaintiff injury.  *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003).

At the commencement of their employment with Dana, Turner and Adleman signed an Employee Invention and Disclosure Agreement ("Agreement") which provided in pertinent part:

> I further agree that I will not, either during or any time after my employment by Dana, use or disclose to any third party any confidential information including, without limitation, technical, financial, marketing, and other business information known to or created by me as a result of my employment by Dana.

(Pl. Exs. 9, 10.)

During their employment, each of the Individual Defendants was also subject to the Standards of Business Conduct ("Standards") which required them to comply with all

14

company policies, avoid conflicts of interest and the appearance of impropriety, and to

protect inside information.  (Pl. Ex. 80.) They were also subject to the  IT Policy which

provided:

> All files and information on your company computer must be delivered to us
> on the termination of your employment or at any time upon our request,
> including any personal files.  This includes information you have created or
> stored on your PC, or on other equipment, whether during or outside of normal
> office hours.  Any duplicate copies that are not returned to us must be deleted
> or destroyed.

(Pl. Ex. 81.)

When Turner and Adleman left their employment at Dana, they each signed an

Acknowledgment Agreement ("Acknowledgment") which provided in pertinent part that

they had reviewed the terms of their Employment Invention and Disclosure Agreement

("Agreement"), and further provided:

> I certify that I understand my obligations pursuant to that Agreement to
> maintain the confidentiality of trade secrets and other confidential information
> of Dana.  I further certify that I have honored these obligations and I have not
> and will not disclose to anyone outside of Dana or use trade secrets and
> confidential information of Dana.  I also understand that such information may
> be contained in documents, computer files or disks, or in my own head.
>
> I also promise that I will review my personal and home files, including
> computer files and disks, and promptly return to Dana any confidential or
> proprietary information that I may discover is in my possession.

(Pl. Exs. 32, 40.)

Turner and Adleman do not deny that the information they downloaded just prior to

their resignation included Dana's confidential or proprietary information.   Turner and

15

Adleman nevertheless contend that they are entitled to summary judgment on the breach of contract claim because there is no evidence that they failed to promptly return all Dana files, or that they used or disclosed Dana's confidential information.  Turner and Adleman contend that it is undisputed that they returned all Dana computerized files and other Dana property within three weeks of leaving their employment at Dana.  Turner returned his USB device on April 29, 2010, and Turner and Adleman turned over all remaining Dana files and other property in their possession to a U.S. Marshal on May 15, 2010.

Because the Acknowledgment Agreement required them to "promptly return" any confidential or proprietary information, and because the timing of the return was generally left to the employee's "best judgment," (Davis Dep. at 85), Turner and Adleman contend that Dana has not created an issue of fact as to their breach of the Acknowledgment Agreement.

The Court finds Defendants' argument insufficient as a basis for summary judgment. Turner and Adleman copied Dana's confidential information on the eve of leaving Dana, and knew that they had confidential information in their possession when they signed the Acknowledgment Agreement.  Because they did not return all of the Dana materials in their possession until Dana contacted them and initiated this lawsuit, there is a question of fact as to whether they returned the materials "promptly."

There is also a question of fact as to whether Turner and Adleman returned all of the Dana materials taken.  Dana has presented evidence that Dana files were downloaded from Turner's computer onto a USB device on March 16, 2010, which coincided with the time

16

period during which Turner was interviewing with American Axle.  Turner denies any recollection of this USB device, noting that it was routine for engineers to use USB devices to share files and laptops during review meetings.  (Turner Dep. 111-12.)  Notwithstanding this denial, viewing the facts in the light most favorable to Dana, including Turner's admitted downloading of Dana confidential information, his failure to return the materials immediately upon his signing of the Acknowledgment Agreement, evidence of Wenstrup's possession and use of Dana confidential information, and evidence of American Axle's attempt to enter into the commercial axle field, an inference can be drawn that Turner provided information to American Axle prior to his departure from Dana.

Finally, although Dana has not presented evidence that any of the files copied by Turner and Adleman was ever transferred to American Axle's computers, that fact is not conclusive on the breach of contract claims.  Dana has presented evidence that Wenstrup recruited Turner and Adleman; that Turner and Adleman surreptitiously copied and removed Dana confidential files after interviewing with Wenstrup; that Wenstrup kept confidential Dana information on his personal computer that he used in connection with his employment at American Axle; and that American Axle sought Turner and Adleman's input on projects related to the work they did at Dana.  Viewing the evidence in the light most favorable to Dana, and drawing all inferences in its favor, the Court concludes that there is sufficient evidence from which a reasonable jury could infer that Turner and Adleman used or disclosed confidential information.  The Court will accordingly deny the Individual Defendants' motion for summary judgment on the breach of contract claims.

### C. Misappropriation of Trade Secrets -- Count V

Count V of Dana's amended complaint alleges threatened or actual misappropriation of trade secrets in violation of the Michigan Uniform Trade Secrets Act ("MUTSA"), Mich. Comp. Laws  § 445.1903, *et seq.*, against all Defendants.

To establish a cause of action for misappropriation of trade secrets, Plaintiff must establish "(1) the existence of a trade secret, (2) acquisition of the trade secret in confidence; and (3) unauthorized use or disclosure." *Henkel Corp. v. Cox*, 386 F. Supp. 2d 898, 902 (E.D. Mich. 2005) (citing *Aerospace Am., Inc. v. Abatement Techs., Inc.*, 738 F. Supp. 1061, 1069 (E.D. Mich. 1990).

Defendants move for summary judgment on Plaintiff's MUTSA claim on the basis that Plaintiff has failed to identify the alleged trade secrets at issue, and because Plaintiff has failed to show unauthorized use or disclosure.

### 1. Identification

"For information to constitute a trade secret under Michigan law, the information must (1) derive economic value from the fact that it is not known to others who could make use of it, and (2) be the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410 (6th Cir. 2006) (citing Mich. Comp. Laws § 445.l902(d)).

Michigan courts have held that an alleged trade secret must be identified "clearly, unambiguously, and with specificity." *Utilase, Inc. v. Williamson*, No. 98-1233, 98-1320,

1999 WL 717969, at *6 (6th Cir. Sept. 10, 1999) (quoting *Shatterproof Glass Corp. v. Guardian, Glass Co.*, 322 F. Supp. 854, 867 (E.D. Mich. 1970)).  Accordingly, "[a] party alleging trade secret misappropriation must particularize and identify the purportedly misappropriated trade secrets with specificity."  *Compuware Corp. v. Intern. Bus. Machs. Corp.*, 2003 WL 23212863, at *6 (E.D. Mich. Dec. 19, 2003). (citing *Utilase*, 1999 WL 717969, at *6).  The identification of alleged trade secrets is important because "the general knowledge of an employee does not constitute a trade secret," *Lowry Holding Co., Inc. v. Geroco Tech Holding Corp.*, No. 303694, 2012 WL 1890231, at *3 (Mich. Ct. App. 2012), and the concept of misappropriation of trade secrets "must not compromise the right of employees to change jobs." *Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 535 (6th Cir. 2008).  Accordingly, to establish a trade-secrets claim, the party "must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets."  *Id.* (quoting *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 251 Mich. App. 125, 649 N.W.2d 808, 813 (2002)).  However, if a trade secret is based on a combination of both protected and unprotected material, the plaintiff is not required to identify which components of the protected material is secret.  *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 411 (6th Cir. 2006) ("When material such as design drawings or manuals are trade secrets based on a unique combination of both protected and unprotected material, a plaintiff should not be obligated to identify which components of the protected material is secret." ).

Defendants contend that Defendants have not identified what trade secrets have been misappropriated. The specific information that Dana claims is covered by the MUTSA is itemized in Dana's response brief. Dana has identified numerous exhibits from American Axle emails or engineering journals that Dana contends contained Dana trade secrets. (Dkt. No. 245, Pl. Br. pp. 18-19, 21-23 (citing to attached exhibits).) Mark Davis testified at his deposition why the information was confidential.

Undoubtedly, some of the references in the exhibits identified by Dana could be classified as general knowledge that would not be actionable. However, it is not possible for the Court to determine on summary judgment whether the information reflects the use of Dana's trade secrets as opposed to generalized engineering knowledge. The Court is satisfied that the information identified by Dana is sufficient to put Defendants on notice of the nature of Plaintiff's MUSTA claims.

**2. Unauthorized Use or Disclosure**

Defendants also contend that they are entitled to summary judgment on Plaintiff's MUTSA claim because Dana has produced no evidence of unauthorized use or disclosure. According to Defendants, the only evidence Plaintiff has offered regarding unauthorized use is that Leo Wenstrup accessed 15 Dana documents during his first months of employment at American Axle, but Dana has still provided no evidence that the documents were disclosed to American Axle or used by American Axle.

Defendants rely in part on the fact that no Dana documents were found on American Axle computers.  Assuming this is the case, it is not conclusive proof that there was no disclosure.  Dana has produced evidence that Wenstrup referred in an email to information on his personal computer in his car (Ex. 19), that Wenstrup's personal computer ("Mom's PC") contained Dana files, and that Wenstrup ran two cleaning programs on Mom's PC during the pendency of this case.   Dana has also produced evidence that not all relevant American Axle computers were searched or preserved, such as the computer of John Sofia, American Axle's commercial vehicle business unit director.  (Pl. Ex. 13, Sofia Dep. 165-66).

Dana contends that Defendants used Dana proprietary information to improve specific American Axle projects and to build a competitive commercial vehicle program.  Dana has not come forward with any direct evidence of unauthorized use or disclosure.  Dana's evidence on this issue is wholly circumstantial.  Dana has presented evidence that Wenstrup maintained Dana files on his personal computer, (Pl. Ex. 37); that Wenstrup accessed his personal computer while at work for work information; that Wenstrup accessed information about Hino on his personal computer while he was making presentations to Hino on behalf of American Axle (Wenstrup Dep. 300); that Wenstrup's emails to other engineers at American Axle made reference directly or indirectly to confidential matters he learned at Dana;[2] and that American Axle was in possession of a number of confidential Dana

---

[2]Wenstrum's emails include reference to "Dana requirements for interaxle driveline JWAs," (Pl. Ex. 51); providing "a copy of the Dana DS404 which is the same fit-up as DSP40 tandem we have" (Pl. Ex. 52); "I am including an Eaton engineering datasheet from
(continued...)

documents.[3]

Dana's evidence with respect to Turner and Adleman includes their surreptitious copying of Dana confidential information, their lack of candor concerning their possession of Dana's confidential information, and their participation in projects and peer reviews at American Axle that paralleled their work at Dana.[4] Dana also presents evidence that Turner accessed 2,632 Dana computer files on March 11, 2010, prior to meeting with Wenstrup, and that a USB drive used on Turner's computer on March 16, 2010, during the same time period that Turner was interviewing with American Axle, has not been accounted for. (Pl. Ex. 26;

---

[2](...continued)
1994 of the 26080S" (Pl. Ex. 53); "Here is a list of tests I am familiar with running as part of the development of a new commercial axle" (Ex. 64); a photo of the Eaton/Dana impact machine (Pl. Ex. 66); "These numbers work out pretty close to numbers I remember for similar housing configurations."(Pl. Ex. 90); "Here is Dana pump detail in 40K front head," with an attached Dana pamphlet re Spicer Drive Axles (Pl. Ex. 91).

[3]The documents include Dana plant and shipping failures; (Pl. Ex. 54); Dana Gear-Drive, Bevel chart number 128361 (Pl. Ex. 55); Dana Gear- Drive, Bevel chart number 6000020 (Ex. 56); a copy of the Dana Forging Material Chart number 6000080 (Pl. Ex. 57); Dana Gear - Drive/Hypoid chart number 6000087 (Pl. Ex. 58); Dana Set - Gear & Pinion chart number 6000501 (Pl. Ex. 59); Dana commercial vehicle profitability and preliminary recommendation chart (Pl. Ex. 63); a list of axle models and prices (Pl. Ex. 67).

[4]Dana has produced evidence that Wenstrup or others at American Axle requested Turner's input on the 15.3 axle (Pl. Exs. 42-44, emails); gave Turner and Adleman access to the "PMES" drawing system for the 15.3 axle (Pl. Ex. 45); requested Turner's assistance on a 40T nose bearing failure (Pl. Ex. 46); requested Turner to review Wenstrup's recollection of tests run on new axle development projects (Pl. Ex. 86); requested Turner to participate in a peer review of the Dana 404 axle, a product he had worked on while at Dana (Turner Dep. 37); requested Adleman to provide the Mack specification for the 1541RH (Pl. Ex. 87).

Turner Dep. 111-12.)  Finally, Dana presents evidence of American Axle's rapid entry into the commercial axle market.

Defendants have presented evidence denying any unauthorized use and disclosure, and challenging Plaintiff's conclusions that their communications concerned matters of trade secret rather than general knowledge.  They have also presented evidence from their computer expert, Kevin J. Ripa, challenging some of Plaintiff's computer expert Hendricks' conclusions regarding whether files were accessed or copied, and whether Wenstrup's personal computer was cleaned.

In reviewing a motion for summary judgment, the Court "cannot weigh the evidence or make credibility determinations."  *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569-70 (6th Cir. 2012) (citing *Liberty Lobby*, 477 U.S. at 255).  Moreover, the Court is not only required to construe the evidence in the light most favorable to the non-moving party, but also to draw all reasonable inferences from the evidence in favor of the nonmoving party.  *See Martin*, 561 F.3d at 443.  Despite the fact that Dana's evidence of unauthorized use is circumstantial and does not appear to be very strong, particularly with respect to Defendants Turner and Adleman, there is nevertheless sufficient evidence from which a jury could reasonably infer unauthorized use.   Accordingly, Defendants' motion for summary judgment on Plaintiff's MUTSA claim will be denied.

**D.  Fiduciary Duty, Count VI**

Count VI of Dana's amended complaint is a breach of fiduciary duty claim against Wenstrup, Turner and Adleman.  Dana alleges that "[a]s high level employees of Dana,

Wenstrup, Turner and Adleman had a duty to act in good faith and solely for the benefit of Dana in all matters within the scope of his employment." (Am. Compl. ¶ 151.)

The Individual Defendants move for summary judgment on Count VI because they were not high level employees upon whom the law imposes a fiduciary duty. Adleman was Product Engineer II, Turner was a Chief Engineer, and Wenstrup never became a director. In response, Dana contends that all employees owe their employers a fiduciary duty.

Michigan law requires high level employees such as corporate officers and members of corporate boards of directors to conduct themselves in a manner consistent with a fiduciary duty to their corporate employer. *See Plaza Securities Co. v. Fruehauf Corp.*, 643 F. Supp. 1535, 1542 (E.D. Mich. 1986) ("In Michigan, corporate directors owe the fiduciary duties of care and loyalty to the corporation and to the shareholders."); *Wallad v. Access BIDCO, Inc.*, 236 Mich. App. 303, 306-07 (1999) ("[T]he directors of a corporation owe fiduciary duties to stockholders and are bound to act in good faith for the benefit of the corporation.").

Dana has presented some authority in support of its contention that all employees owe their employers a fiduciary duty. For example, in *In re Sullivan*, 305 BR 809, 819 (Bankr. W.D. Mich. 2004), the court noted that "Michigan common law imposes a fiduciary duty of loyalty on **all employees** of a corporation that forbids them from taking action contrary to the interests of their employers." *Id.* at 819 (emphasis added) (citing *Clark & Gregory, Inc. v. Hanson (In re Hanson)*, 225 B.R. 366, 375 (Bankr. W.D. Mich.1998)). Similarly, in *In re Hanson*, cited in *Sullivan*, the court cited the Restatement (Second) of Agency § 387 in

24

support of the proposition that the common law imposes a duty of loyalty on employees, forbidding them from taking action contrary to the interests of their employers. 225 B.R. at 375.

These cases do not support Dana's contention that all employees owe their employers a fiduciary duty. The language in these cases that purports to apply to "all employees" is dicta because the employees whose conduct was at issue *Sullivan* and in *Hanson* were high level employees. *See Sullivan*, 305 B.R. at 818 (debtor was the president of the corporation); *Hanson*, 225 B.R. at 369 (debtor was the general manager of the company).

The other cases cited by Dana similarly fail to support Dana's contention that all employees owe their employers a fiduciary duty. The source of the fiduciary duties found in *Chem Trend v. McCarthy*, 780 F. Supp. 458, 461 (E.D. Mich. 1991), was not merely the employer-employee relationship, but the existence of an agency relationship. *Id.* at 459 (noting that during his employment, McCarthy was an agent for his employer). In *Electronic Planroom, Inc. v.McGraw-Hill Companies, Inc.*, 135 F. Supp. 2d 805 (E.D. Mich. 2001), there was no ruling on the scope of an employee's fiduciary duty because the defendants did not deny that the vice-president of sales and marketing owed fiduciary duties to his employer. *Id.* at 823-24.

The general rule is that the employer-employee relationship does not give rise to a fiduciary relationship unless the employee is a high-level employee, or if there is a specific agency relationship. *See also* 3 *Fletcher Cyclopedia of the Law of Corporations*, § 846, p. 1 (Thompson Reuters 2010) ("An officer's fiduciary duties appear coextensive with those

of directors . . . However, the concept of fiduciary duty generally does not apply to typical employees."). *See also Cheney v. IPD Analytics, L.L.C.*, No. 08-23188-CIV, 2009 WL 3806171, at *5  (S.D. Fla. Aug. 20, 2009) (holding that traditional employer-employee relationship did not generate a fiduciary relationship); *Dalton v. Camp*, 548 S.E. 2d 704, 708 (Sup. Ct. N.C. 2011) (noting the general rule that an employer/employee relationship is not a confidential relationship that gives rise to a fiduciary duty).

The Individual Defendants were middle level employees.  There is no evidence that they were high level executives or key designers of the company's strategic plans and operations, and Dana has not set forth any specific facts showing that there is a genuine issue for trial whether an agency relationship existed between the Individual Defendants and Dana. Accordingly, the Court will grant the Individual Defendants' motion for summary judgment on Plaintiff's fiduciary duty claim.

**E.  Unfair Competition -- Count VII**

Count VII of Dana's amended complaint alleges unfair competition against all Defendants.

This Court previously held that, to the extent Plaintiff's unfair competition claim is based on allegations that Defendants took  information that could be used to their competitive advantage, the allegations were displaced or preempted by MUTSA.  (Dkt. No.  122, 10/17/11 Op. 8.)  The Court noted, however, that MUTSA does not displace an unfair competition claim based on misconduct which could be deemed unethical or unfair irrespective of whether trade secrets are involved.  (10/17/11 Op. 7.)  Thus, the Court noted

that Dana's unfair competition claim would only survive summary judgment if Dana established that American Axle engaged in conduct "beyond hiring the employees in an effort to get Plaintiff's trade secrets." (Dkt. No. 122, 10/17/11 Op. 8.)

"[U]nfair competition 'prohibits unfair and unethical trade practices that are harmful to one's competitors or to the general public.'" *Consol. Rail Corp. v. Grand Trunk W. R.R. Co.*, No. 09-10179, 2009 WL 3460334, at *14 (E.D. Mich. Oct. 22, 2009) (quoting *ATCO Indus., Ins. v. Sentek Corp.*, Nos. 232055 & 235398, 2003 WL 21582962, at *3 (Mich. Ct. App. July 10, 2003).

Dana contends that both its unfair competition claim and its tortious interference claims are based on evidence demonstrating a "concentrated effort" by American Axle and the Individual Defendants "to improperly compete with Dana by raiding Dana employees and procuring and utilizing proprietary information to impede Dana's ability to compete." (Pl. Br. 38.)

Defendants contend that Dana's response reveals that its unfair competition claim is based on nothing more than an allegation that American Axle hired the Individual Defendants in order to gain access to and use Dana's trade secret information. Defendants contend that such a claim, as this Court has already noted, is preempted by MUTSA.

It appears that Dana's unfair competition claim is not based solely on the use of trade secrets for competitive advantage, but also on American Axle's targeted solicitation of employees in Dana's commercial vehicle group for purposes not only of misappropriating Dana's trade secrets, but also to enable American Axle to compete unfairly in the

marketplace.  *See* Part II(F), Tortious Interference, below.  Dana has articulated conduct that could be deemed unethical or unfair irrespective of whether trade secrets are involved, and Dana has presented evidence in support of this claim.  Accordingly, Defendants' motion for summary judgment on the unfair competition claim will be denied.

## F. Tortious Interference - Count VIII

Count VIII of Dana's amended complaint alleges tortious interference against Defendant American Axle.

To prevail on its tortious interference claim, Plaintiff must show "the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff."  *Badiee v. Brighton Area Sch.*, 265 Mich. App. 343, 365-66 (2005) (quoting *Mino v. Clio Sch. Dist.*, 255 Mich. App. 60, 78 (2003).  "[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another."  *Cedroni Assoc. v. Tomblinson, Harburn Assoc.*, 290 Mich. App. 577, 600 (2010) (quoting *Badiee*, 265 Mich. App. at 367).

Defendants move for summary judgment on the tortious interference claim on the basis that Dana did not have a valid business relationship with the individual Defendants. Defendants note that Wenstrup was not employed by Dana when he was hired by American

Axle, and that Turner and Adleman had both begun looking for alternative positions when Dana announced that it would be closing its Kalamazoo facility.

The fact that Turner and Adleman had decided that they would not continue to work for Dana after the Kalamazoo office was closed does not necessarily show that Dana did not have a valid business relationship with them. *See Fidelity Nat. Title Ins. Co. v. Title First Agency, Inc.*, No. 06-cv-13961, 2008 WL 4371838, at *8 (E.D. Mich. Sept. 22, 2008) (rejecting argument that no reasonable jury could conclude that employer had an expectation of a relationship with employees that it had chosen to terminate).

In addition, Defendants' argument interprets Dana's tortious interference claim too narrowly.  The interference alleged by Dana is not simply the hiring of individual Dana employees, but the targeting of a specific Dana technology group, the commercial vehicle division, for purposes of misappropriating Dana's trade secrets and competing unfairly in the marketplace.  Dana has produced evidence that Wenstrup, as part of a "key strategic initiative," created a list of Dana drive axle design engineers, the "Dream Team," for recruiting purposes.  (Wenstrup Dep. 180-81; Pl. Exs. 23-24.)

Viewing the facts and the reasonable inferences in the light most favorable to Dana, the Court is satisfied that Dana's evidence regarding Wenstrup's use of Dana trade secrets while at American Axle, his targeted solicitation of Turner, Adleman, and Davis of the commercial vehicle division, and Turner and Adleman's copying of files containing Dana trade secrets prior to leaving Dana, create material issues of fact for trial as to whether American Axle tortiously interfered with Dana's contracts and business relationships.

**G. Damages**

Defendants also move for summary judgment on all of Plaintiff's claims on the basis that Plaintiff has no evidence of damages.

Defendants contend that Dana has not offered any evidence which creates a genuine issue of material fact as to whether damages were sustained by Dana at all. *See Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 837 & n.6 (6th Cir. 2007) (noting that summary judgment would be warranted if the plaintiff made no showing whatsoever that it suffered damages). Defendants point out that Dana has not identified any lost sales, lost customers, or any other direct losses to Dana. Plaintiff's expert on damages, Thomas Frazee, has no traditional damages proofs such as lost profits, or lost sales, nor does he have any proof of benefit to the individual Defendants from the use of the trade secrets. Instead, Frazee has calculated damages based on "saved costs", i.e., money spent by Dana that appears to be benefitting American Axle.

Frazee summarized his approach to damages in his expert report: "For example, if 20% of Dana's annual expenditures in these Departments (averaging $7.5 million per year) are now benefitting American Axle, and the related technology, secrets, or other information was developed by Dana over a four year period, damages would equal a minimum of $6 million." (Pl. Ex. 92, Frazee Rpt. 9.) Defendants contend that Frazee used $6 million as an example of using the formula, but not as an estimate of damages. Defendants do not contest Frazee's proposed methodology. Instead, they contend that Frazee never completed the calculation because Dana never obtained the documentation of American Axle's project

development history and financial information that would be needed to perform a "saved costs" analysis. (Dkt. No. 188, MJ Order) (denying Plaintiff's motion to compel discovery).

Frazee stated in his expert report that he believed his example to be "an appropriate and conservative measure of damages." (Frazee Rpt.. 9.)  Frazee provided a synthesis of Dana's expenses by department for the years 2006-09. (Frazee Rpt., Sch. D-2.)  Frazee also testified that he believed his 20% estimate was reasonable. (Frazee Dep. 104.)  Davis testified as to the value of Dana's trade secrets and the damage that would be caused if those trade secrets were used by a competitor. (Pl. Ex. 50, Davis Dep. 197-200, 217, 240, 307-10, 320.) Frazee's ultimate damages calculation will depend on the proofs developed during the trial on American Axle's project development history and financial information.  Dana is at some disadvantage because it did not obtain this information during discovery, but the lack of specific financial information from American Axle does not suggest that Dana will be unable to show that American Axle saved costs.

Whether American Axle had been in the commercial vehicle axle market for 12 years before hiring Wenstrup, as Amercian Axle contends, or whether it was only able to make an entrance into that market after hiring the three Individual Defendants, and whether American Axle increased its presence in that market through use of Dana's confidential and proprietary information are all issues of fact for trial.

Dana has presented a basis for its damage claim.  The Court cannot say, on the present record, that Dana will not be able to show that it has been damaged, or the extent of those damages.

31

## III.

For the reasons stated herein, American Axle's motion for summary judgment (Dkt. No. 199) will be denied, and the Individual Defendants' motion for summary judgment (Dkt. No. 196) will be granted as to Plaintiff's CFAA and fiduciary duty claims (Counts I and VI), and denied as to all remaining claims.

An order consistent with this opinion will be entered.


Dated: June 29, 2012                           /s/ Robert Holmes Bell
                                               ROBERT HOLMES BELL
                                               UNITED STATES DISTRICT JUDGE