# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DANA LIMITED, an Ohio limited
liability company,

      Plaintiff,

                                 File No. 1:10-CV-450

v.

                                 HON. ROBERT HOLMES BELL

AMERICAN AXLE AND
MANUFACTURING HOLDINGS, INC.,
et al.,

      Defendants.

_____/

## **O P I N I O N**

In April 2010, Defendants Jacob Adleman and Gary Turner left their employment at Plaintiff Dana Ltd., and began working for Defendant American Axle and Manufacturing Holdings, Inc. Prior to leaving their employment at Dana they had downloaded numerous Dana files. On May 11, 2010, Dana filed this action alleging theft of trade secrets. Following a hearing on Dana's motion for preliminary injunction, this Court entered an order preliminarily enjoining Defendants from using Dana's information, and requiring Defendants to preserve, account for and return all Dana files and data and to make computers and storage devices available for inspection. (Dkt. No. 24.) Defendant Dana filed an amended complaint on April 7, 2011, adding Leo Wenstrup as a defendant after it learned that he had also downloaded numerous files from Dana before accepting employment at American Axle.

Dana's amended complaint asserted the following claims: violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, against Turner and Adleman (Count 1); breach of contract against Turner, Adleman and Wenstrup (Counts 2, 3, 4); misappropriation of trade secrets under Michigan's Uniform Trade Secrets Act, Mich. Comp. Laws § 445.1903, *et seq.*, against all defendants (Count 5); breach of fiduciary duty against Wenstrup, Turner, and Adleman (Count 6); tortious interference against American Axle (Count 7), and unfair competition against all defendants (Count 8). (Dkt. No. 73.) On June 23, 2012, this Court entered partial summary judgment in favor of the individual defendants and dismissed Counts 1 and 6. (Dkt. Nos. 282, 283.)

The remaining claims were tried to the Court without a jury over a five-day period from February 21, 2013, to February 27, 2013. The Court heard the testimony of Rebecca R. Hendricks, Mark Davis, Jacob Adleman, Gary Turner, Leo Wenstrup, Thomas Frazee, Kevin Ripa, John Sofia, Hector Orozco, Bruce Knapp, and Robert Gerlach.[1] The Court has also reviewed the parties' designated excerpts from the deposition testimony of Gregory Parent, Robin Pillars, Winston Platt, Janie Sre, Gregory Andres, Kristen Nowak, and Herbert Larsen.[2] This opinion contains the Court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

---

[1]Transcript references in this opinion refer to the transcripts of the bench trial found at Docket Nos. 375-79.

[2]Deposition references in this opinion refer to the deposition transcripts found at Docket Nos. 385, 386.

# I. BACKGROUND AND FINDINGS OF FACT

Dana is a manufacturer of axles, driveshafts, and chassis for the automotive industry. In 1998, Dana purchased the Eaton axle division and continued Eaton's commercial vehicle engineering operation in Kalamazoo, Michigan. (Davis, Tr. 113.) Dana has been in the business of manufacturing commercial axles for over 100 years. (Sofia, Tr. 781.) Dana and Meritor, Inc. are the two leading manufacturers of heavy-duty axles (classes 4-8) in the North American market. (Sofia, Tr. 778, 781-82.)

Defendant American Axle was formed in 1994 with the purchase of assets from General Motors. (Sofia, Tr. 765.) American Axle has a manufacturing facility in Three Rivers, Michigan. The original focus of American Axle's business was on axles and driveline systems for passenger cars and light trucks (class 1-3), but its goal from the beginning was to service the entire range of vehicles on a global basis. (Sofia, Tr. 766.) In 1998, American Axle purchased the assets of Albion Automotive in Scotland, a company involved in the manufacture of heavier axles (classes 4-8), including tandem axles, for commercial vehicle applications. (Sofia, Tr. 767-69.) In 2007, American Axle formed a commercial vehicle business unit within the corporation. (Sofia, Tr. 782.) In 2008, American Axle brought Winston Platt, chief engineer of Albion's commercial vehicle division, to Fort Wayne, Indiana, to head up American Axle's new commercial vehicle division. (Platt Dep. 15-16; Sofia, Tr. 785-86.) As auto industry began rebounding from the 2008-09 economic downturn, American Axle began to expand its commercial vehicle

business unit. (Sofia, Tr. 782, 789-90). American Axle's target markets are the emerging growth markets of China, India and Asia. (Sofia, Tr. 705-06, 812.) It has never been American Axle's intention to compete head-to-head with Dana and Meritor in the North American market with respect to axles for vehicles in classes 4-8 due to the maturity of the market. (Sofia, Tr. 777-78, 782; Orozco, Tr. 837.)

Defendant Leo Wenstrup had been employed as an engineer by Dana and its predecessor, Eaton, at the Kalamazoo facility for over 30 years. (Wenstrup, Tr. 490-91.) From 1996-2005 he was Dana's Chief Engineer for Commercial Vehicle Drive Axles. (Wenstrup, Tr. 512.) On April 30, 2009, Wenstrup lost his job at Dana as part of a reduction in force that had been triggered by the 2008-09 downturn in the automotive market. (Wenstrup, Tr. 491.)

When Wenstrup was terminated, he had an exit meeting focused on severance and health care benefits, and a release of liability. (Wenstrup, Tr. 493.) Wenstrup was not reminded of his confidentiality obligations. (*Id*.) Following each exit meeting, Dana either escorted the discharged employees to their offices to gather their belongings, or allowed them to make an appointment to retrieve them at a later date. (Pillars Dep. 12.) On May 7, 2009, a week after his separation, Wenstrup returned to Dana to retrieve items from his office. Wenstrup testified that Robin Pillars, a payroll coordinator in the Dana Human Resources department, accompanied Wenstrup to his office. (Wenstrup, Tr. 380.) Pillars has no memory of escorting Wenstrup to his office. She does recall escorting others to their offices

on the day they were terminated, but she testified that she did not monitor those who came back with an appointment because, to the best of her knowledge, they were handled after hours or on weekends and were overseen by the Facilities Security manager or the HR manager. (Pillars Dep. 8-12, 26.)

Whether or not Pillars accompanied Wenstrup, the Court has no doubt that someone from Dana's HR or Security department accompanied and monitored Wenstrup as he connected his Dana computer to his Western Digital MyBook external hard drive digital storage device (the MyBook device), logged onto his Dana computer, and copied the entire contents of the "My Documents" portion of the hard drive onto his MyBook device. (Wenstrup, Tr. 380.) Many of the files Wenstrup downloaded were personal, but there were also many Dana files. (Wenstrup, Tr. 447, 498; Ripa, Tr. 726.) Wenstrup testified that he did not have time to separate his personal files from his work files, and that he also wanted to preserve his work files in case he returned to Dana. (Wenstrup, Tr. 498.) Wenstrup did in fact apply for multiple positions at Dana before he finally obtained the position at American Axle. (Wenstrup, Tr. 509.) The Dana monitor did not ask Wenstrup what he was downloading or remind him of his obligations under his Employee Agreement (Ex. 191) or any employment policies. (Wenstrup, Tr.494-98, 560-61.) Wenstrup also packed a box of paper files including personal items, journals, and the Eaton Engineering Data Book. (Wenstrup, Tr. 498-500.) The monitor inspected the box, but did not object to anything he

took.  (Wesnstrup, Tr. 500.) After Wenstrup was terminated, Damir Yaksic of the Dana IT department offered to copy Wenstrup's computer hard drive for him.  (Tr. 508.)

Wenstrup's testimony regarding Dana's lack of concern regarding the copying of files is corroborated by Robert Gerlach, another former Dana engineer who was terminated on April 30, 2009.  Gerlach testified that when he left Dana, Dana's IT department copied the contents of his Dana computer hard drive onto CDs which were delivered to Gerlach by his manager.  (Gerlach, Tr. 914-16, 925-26.)  Gerlach also took three banker boxes of Dana information while an HR representative was watching him. (Gerlach, Tr. 917.)  Gerlach testified that his hard drive contained several thousand Dana-specific files that included warranty data, test procedures, test results, and engineering data sheet PDFs he had downloaded from the internet.  Although he subsequently attempted to return the CDs to Dana, no one at Dana showed any interest in having them returned.  (Gerlach, Tr. 920, 928-29.)

Dana contends it made efforts to protect its information during the April 30, 2009, layoffs, as evidenced by Pillars' testimony.  Pillars testified that on the day of the April 30 layoffs, one employee was prevented from taking a manual, and another employee had to obtain special permission to download personal photos off of her work computer.  (Pillars Dep. 22-23.)  Dana's efforts at protecting its information in April 2009 were haphazard at best.  Whatever steps were taken with other employees, Pillars' testimony does not cast doubt on Wenstrup's description of what occurred on the occasion of his own departure from Dana.

Wenstrup was unemployed for approximately nine months. During this time, he pursued employment with a number of prospective employers, including Dana and its chief competitor, Meritor. (Tr. 508-510.) In February 2010, American Axle hired Wenstrup in February 2010 to work at its Three Rivers facility, with the expectation that he might eventually replace Winston Platt upon his retirement. (Platt Dep. 77; Orozco, Tr. 841-42.)

In January 2010, Dana announced that it would be closing its Kalamazoo engineering operations, and consolidating its commercial vehicle engineering operations in Maumee, Ohio. (Tr. 262.) Around the same time, American Axle was in the midst of launching three axle models for Mack trucks, and needed additional engineers. (Wenstrup, Tr. 516-17; Orozco, Tr. 843.) When John Sofia and Hector Orozco at American Axle learned about the closing of Dana's Kalamazoo facility, they saw it as a potential opportunity for American Axle to hire experienced commercial vehicle engineers. (Sofia, Tr. 791; Orozco, Tr. 843-44.) On February 5, 2010, after Wenstrup was hired by American Axle, but before he began working there, Sofia asked Wenstrup to compile a list of Dana engineers whose skills matched American Axle's commercial vehicle needs and who might become available based on Dana's closing of the Kalamazoo facility. (Orozco, Tr. 844; Wenstrup, Tr. 375-76.)

At this time, Defendants Gary Turner and Jacob Adleman were employed by Dana in its Advanced Engineering Group for Commercial Vehicles. Turner was a Product Engineering Manager, and Adleman was a Product Design Engineer. Soon after Dana announced the closing of its Kalamazoo facility, Turner advised Dana that he would not be

accepting a Maumee job and that he would be seeking employment elsewhere, as he did not want to relocate to Ohio. (Davis, Tr. 222-23.)

Adleman was the most junior and least experienced of the three individual defendants. Adleman was told he had a job in Maumee, but he was not told what title he would have. (Tr. 262.) When Dana announced the closing of the Kalamazoo facility, Adleman did not want to move because he was working on a masters degree at Western Michigan University and was engaged to marry a woman who was also employed in the area. Adleman began to seek employment outside of Dana that would not require him to move. (Tr. 307-09.) He posted his resume online on February 3, 2010. (Adleman, Tr. 271.)

Wenstrup prepared a list of potential engineering resources on behalf of his supervisor, Sofia. (Wenstrup, Tr. 376-77; Ex. 372B.) Wenstrup identified eight people under the headings "Dana's A Team" and "Dana's B Team." He listed each individual's title, years of experience, and telephone number, and commented on each individual's abilities. Wenstrup spoke to most of the individuals before placing their names on the list, and confirmed that they had expressed an interest in not going to Maumee when Dana shut down its Kalamazoo operation. (Wenstrup, Tr. 377-78.) Wenstrup asked Turner if there was a junior engineer that he would recommend for an entry-level engineer position, and Turner recommended Adleman. (Turner, Tr. 331.) On April 22, 2010, Wenstrup updated the chart to reflect each individual's technical expertise, interpersonal qualifications, and availability. (Ex. 42.) The title of the chart is "Dana Engineering Pool from Kalamazoo Tech Center

Move." (*Id.*) On this chart Wenstrup noted that Turner's wife was a Michigan teacher with many years of service, and that he planned to stay in Michigan to protect her retirement. (*Id.*). Wenstrup noted that Adleman's wife was a nurse and that he wanted to stay in the area. (*Id.*) Wenstrup identified Mark Davis, Defendant's representative at trial, as the target candidate for steer axle, and Greg DeWald as the target candidate for off-highway. (Wenstrup, Tr. 488.)

On March 11, 2010, 2,000 files, the entire contents of Turner's MyDocuments folder, were accessed on Turner's Dana work computer over a three hour period. (Hendricks, Tr. 46; Ex. 199; Turner, Tr. 360.) Turner had not yet received a job offer from American Axle. That same day, Turner met Wenstrup for lunch and interviewed with Armstrong, a manufacturing company in Three Rivers, Michigan. (Turner, Tr. 329, 359-60.) Turner does not recall accessing the files. Because some unusual program files called registry files were accessed at the same time, Turner wondered if the files might have been accessed during an automatic virus scan. (*Id.* at 339, 361.) However, he testified that it was also possible that he accessed the files to move them to the network drives for the other engineers within Kalamazoo to access. (*Id.* at 361.)

Adleman also copied volumes of Dana information in March, during the same period of time that he was interviewing with American Axle. Adleman did not have a laptop at Dana. Accordingly, to prepare for out-of-town meetings, he would copy files and bring them on his personal laptop to the meetings. (Adleman, Tr. 281.) Adleman's co-worker, Gregory

Parent, similarly testified that he would copy Dana engineering files onto portable storage devices when he needed to take Dana information to meetings or to out-of-town activities. (Parent Dep. 13-14.) On March 26, Adleman downloaded a significant amount of information in preparation for a scheduled meeting with the engineering team in Maumee, Ohio, to talk about the integration of the Maumee and Kalamazoo engineering departments. (Adleman, Tr. 264-65, 282-83.) Adleman placed the files into folders and zipped the folders to make them smaller. (*Id.* at 282.) Although Adleman was hoping to stay in Kalamazoo, he accepted the job in Maumee until he was able to find a job that would eliminate the need to move. (*Id.* at 284-85.)

Turner and Adleman accepted employment offers from American Axle and resigned from Dana on April 23 and April 26, 2010, respectively. On April 22, 2010, the day before he resigned from Dana, Turner copied numerous files from his Dana computer onto a flash drive. (Turner, Tr. 340.) He testified that he took the documents as a memento or scrapbook of his work at Dana over the 11 years that he had worked there. (*Id.* at 341.)

On April 23, 2010, during Turner's exit interview, Kristen Nowak of the Dana Human Resources ("HR") department expressly asked Turner whether he had any Dana property at home, including documents, files, or computer information. He answered "no." (Ex. 201, Q 30.) She also asked him whether he had returned all of Dana's property, including documents, files and computerized information, and he answered "yes." (Ex. 201, Q 31.) Turner admitted that he was not truthful during the exit interview. (Turner, Tr. 326, 328.)

Nowak had Turner review the terms of his Employee Invention and Disclosure Agreement ("Employee Agreement") (Ex. 5) which he had signed when he began his employment. After reviewing that Agreement, Turner signed an Acknowledgement Agreement in which he promised that he would "review my personal and home files, including computer files and disks, and promptly return to Dana any confidential or proprietary information that I may discover is in my possession." (Ex. 45.)

After Turner's resignation, Dana sent Turner's computer to Rebecca Hendricks, an independent forensic computer expert for analysis. (Nowak Dep. 33.) Dana learned from Hendricks that Turner's files had recently been copied onto a flash drive, and that the flash drive was not among the materials Turner returned. On Wednesday, April 28, at Nowak's direction, Janie Sre from Dana's HR department contacted Turner about the missing flash drive and asked him to return it if he had it. (Turner, Tr. 342; Sre Dep. 69, 72-76; Nowak Dep. 45-46.) Turner returned the flash drive to Dana on Thursday, April 29, less than a week after his resignation. (Turner, Tr. 342.) After leaving Dana, Turner inserted the flash drive into his computer on one occasion to verify that it was the flash drive that Sre had identified. (Turner, Tr. 350.) However, he testified that he did not use or disclose the Dana information he downloaded that day. (Turner, Tr. 344-45.)

On April 25, the night before he resigned, Adleman also copied large quantities of Dana information onto a flash drive. Adleman said he copied the files so that he could review all the projects he had worked on before he updated his resume. (Adleman, Tr. 269,

279.) Adleman testified that when he prepared his resume for American Axle, he did it under haste and had not reviewed all of the projects he had worked on. (Adleman, Tr. 279-80.)

Mark Davis, Dana's director of engineering for commercial vehicle products (Davis, Tr. 112), conducted Adleman's exit interview. During the interview, Davis had Adleman fill out an exit questionnaire. In response to the questions of whether he had any Dana property, and whether he had returned all Dana's property, including documents, files and computer information, Adleman answered that he did not know. (Ex. 205, Qs 30, 31.) In response to the question of what he removed from his office, he answered that he had removed personal pictures and textbooks. (Ex. 205, Q 33.) Adleman did not disclose that he had been at Dana the night before downloading over 2,700 files. (Ex. 205; Tr. 262.) Adleman testified that he did not take the questionnaire seriously. (Adleman, Tr. 322.) After reviewing his Employee Agreement (Ex. 10), Adleman signed the Acknowledgement Agreement and agreed to review his personal and home files, including files and disks, and promptly return any confidential or proprietary information in his possession to Dana. (Adleman, Tr. 258-59; Ex. 49.) At the conclusion of the interview, Davis understood that Adleman might have Dana files which needed to be returned. (Adleman, Tr. 259, 261; Davis, Tr. 183-84.)

Adleman testified that the exit interview had the effect of reminding him of his obligations, and he was beginning to sort through the information when he was served with this lawsuit. He took a final exam in his engineering masters program on April 26, the same

date that he resigned from Dana. (Adleman, Tr. 285-87). He started his new job with American Axle on May 3, and was married on May 15. (Adleman, Tr. 274, 284.) Adleman testified that he although this was an extremely busy time in his life, he still managed to return all Dana information in his possession on May 14, and May 20, 2010, less than three weeks after his resignation. (Adleman, Tr. 297.)

As illustrated above, Dana was significantly more proactive about protecting its trade secrets in April 2010, when Turner and Adleman left than it had been in April 2009, when Wenstrup and Gerlach left. In anticipation of the closing of the Kalamazoo facility and the likely departure of engineers, Dana had prepared an extended exit interview questionnaire and a new procedure for a forensic analysis of the computers of those who were going to a competitor. (Nowak Dep. 37-39, 41, 54-55.) Turner and Adleman were the first two engineers from the Kalamazoo facility who accepted employment at a competitor, and theirs were the first two computers that were sent to an expert for a forensic analysis. (Nowak Dep. 37-38.)

American Axle initially assigned Turner and Adleman to complete the launch of the Mack build-to-print product. (Turner, Tr. 331.) Because this suit was filed within days of their employment, American Axle kept Turner and Adleman in the Mack group. The Mack project involves working on designs created by Volvo for the Mack axle. Accordingly, Turner and Adleman's work has not involved designing heavy-duty axles. Turner has spent 99 percent of his time at American Axle on the Mack project and the remaining one percent

on general engineering support or input that is not project-specific. (Turner, Tr. 331-32, 352.)

Turner and Adleman testified that they returned all of the files they copied, and that they did not use or disclose any Dana confidential or proprietary information, (Adleman, Tr. 296-977, 305; Turner, Tr. 344-45, 365), and there is no evidence to the contrary. No Dana information was found on any of the American Axle computers analyzed by Hendricks, Dana's computer expert. (Hendricks, Tr. 81-82.) Davis had no knowledge of any Dana files still being available to Turner or Adleman after they turned their computers and storage devices over to Dana. Neither did Davis have any personal knowledge of any of the individual defendants or American Axle ever using any of the downloaded Dana files. (Davis, Tr. 193-94.) Dana's experts, Larsen and Frazee, similarly could not identify any use of Dana confidential files. (Frazee, Tr. 655; Larsen Dep. 97-98, 101, 115, 120, 130.)

Like Turner and Adleman, Wenstrup also took large quantities of Dana information. However, in contrast to Turner and Adleman, Wenstrup had the files in his possession for a longer period of time, and there is evidence that Wenstrup accessed at least some of the Dana information after he began working for American Axle. However, the extent of the access is minimal. None of the Dana files were found on any of the American Axle computers Dana investigated. Moreover, of all the documents downloaded by Wenstrup, Dana has shown that Wenstrup accessed only ten of them.

Dana has presented evidence that Wenstrup accessed Dana documents on his MyBook

on three dates in 2010: January 26, February 17, and February 23. With respect to the January 26 date, Hendricks testified that she could not tell whether the files were accessed by Wenstrup or whether they were accessed by some computer function without human involvement. (Hendricks, Tr. 70, 83.) She could not tell how long a file was accessed. It could have been only for a fraction of a second. (*Id.*) She did not find any evidence of printing, forwarding, or subsequent accessing of any of these files by Wenstrup. (*Id.* at 71.) Wenstrup testified that the large number of files were accessed by a computer function or process and not by him. (Wenstrup, Tr. 533-34.) Kevin Ripa, Defendants' computer expert, also testified that, in his opinion, the access was "automated access" without human involvement. (Ripa, Tr. 723-24.)

On February 17 and February 23, 2010, Wenstrup accessed ten Dana files on his personal computer. (Hendricks, Tr. 72, 73, 78; Ex. 188V-Z; Ex. 188 AA-AF; Ex. 212; Ex. 214; Ex. 216; Ex. 218.) Wenstrup does not deny accessing these documents. (Wenstrup, Tr. 404.) The total time spent on these files was 17 minutes: 5 minutes on February 17 and 12 minutes on February 23. (Hendricks, Tr. 72, 73, 78.) Other files were also accessed during that 17-minute time-frame. (*Id.* at 78.) The computer experts agreed that the only time Wenstrup accessed these files was on February 17 and 23. Wenstrup never revisited any of these files, and there is no evidence that he copied or forwarded any of these files. (Hendricks, Tr. 76; Ripa, Tr. 724-25.)

Although Dana's investigation of Wenstrup's MyBook revealed that he only accessed

ten documents in February 2010, and that he has not accessed any of the documents since then, Dana contends that this merely shows that Wenstrup did not access the documents on his MyBook. Dana contends that there is circumstantial evidence that Wenstrup kept confidential Dana files on another computer and failed to turn them over to Dana. Dana contends that Wenstrup must have accessed the documents from another computer because he referenced Dana confidential information in his emails and engineering journal and because there is evidence that he delayed turning over another computer.

The Court's review of Wenstrup's emails and engineering journal entries does not persuade the Court that Wenstrup accessed confidential Dana files after February 2010. The information contained in the emails and engineering journal is largely generic, and is more likely based on Wenstrup's memory than on a review of the detailed Dana files that were in his possession.[3]

Dana asserts that during discovery Wenstrup failed to timely produce his wife's personal computer referred to as "Mom's PC" in violation of the Court's preliminary injunction order. Dana presented evidence that some of the files on Wenstrup's MyBook external hard drive referenced Mom's PC in their file path history. (Hendricks, Tr. 29-30.) Wenstrup testified that, to the best of his knowledge, he did not store Dana documents on Mom's PC. (Wenstrup, Tr. 514-16.) Wenstrup's explanation for Mom's PC showing up in

---

[3]Whether or not the information disclosed in the emails or considered in the engineering journal was a trade secret will be addressed in part II(A)(1) below, in the discussion of MUTSA trade secrets.

the file path history of a number of Dana files accessed on February 7, 2009, and February 14, 2009, is that he used the MyBook external hard drive to back up files from all the computers in his house, and he may not have paid attention to where his laptop directory was created. (Wenstrup, Tr. 516.) Wenstrup's testimony is supported by the testimony of Defendant's computer expert, Ripa. Ripa testified that although some of the Dana files on Wenstrup's MyBook external hard drive referenced Mom's PC in their file path history, there was no evidence to show that any Dana files were ever on Mom's PC. (Ripa, Tr. 735.) Ripa testified that it was more likely that Dana files on the MyBook had merely been stored in the Mom's PC folder on the MyBook. (*Id.*)

Dana further asserts that before finally turning over Mom's PC, Wenstrup erased the Dana files that had been stored on Mom's PC. Dana has presented evidence that file-cleaning software called CCleaner and File Shredder were run on Mom's PC on May 20, 2010, the day of the preliminary injunction hearing, and again on August 3, 2011, the day of Wenstrup's deposition. (Hendricks, Tr. 37-38.) Dana contends that this is evidence that Wenstrup downloaded files he had removed from Dana onto Mom's PC and then tried to destroy them. Hendricks did not know how many times CCleaner was used on Mom's PC, and she did not have an opinion as to whether or not any files or data was deleted from Mom's PC as a result of the use of CCleaner. (Hendricks, Tr. 90.)

The evidence regarding the emails, engineering journal, and Mom's PC is not sufficient to persuade the Court that Wenstrup stored Dana files on another computer, that

he accessed Dana files after February 2010, or that he attempted to destroy material evidence. Dana's argument assumes, first, that Wenstrup kept Dana files on his wife's computer, and second, that he intentionally ran the programs with the intent of removing those Dana files. Based on the discussion above, the evidence is equivocal at best as to whether Wenstrup ever placed Dana files on Mom's PC. Second, Dana has not shown by a preponderance of the evidence that Wenstrup intentionally ran the file-cleaning programs. Wenstrup has no recollection of running these cleaning programs. (Wenstrup, Tr. 381.) Hendricks discussed access of the cleaning software, but admitted that she had no evidence that any one ever used the programs to target the removal of any computer files, and she never completed her investigation of the possible use of the two software programs. (Hendricks, Tr. 39, 89-90.) Ripa testified that because there were files in the recycle bin of Mom's PC which were years old, neither CCleaner nor File Shredder had ever been run on Mom's PC. (Ripa, Tr. 742-45.) According to Ripa, Mom's PC was hardly working, so the cleaning programs were likely accessed as a result of a virus scan rather than by human activity. (Ripa, Tr. 727, 740-41.)

Upon review of the evidence presented, the Court concludes that the evidence does not support a finding that Wenstrup stored Dana files on Mom's PC or that he erased any Dana files from Mom's PC. The Court finds that Wenstrup accessed ten Dana files after he began working for American Axle, and those are the files accessed on February 16 and February 23, 2010.

## II. ANALYSIS

### A. Michigan Uniform Trade Secrets Act ("MUTSA")

In Count 5 Dana alleges a claim against all of the defendants under the MUTSA. The MUTSA provides a statutory cause of action and remedies for the misappropriation of trade secrets. Mich. Comp. Laws 445.1903, .1904; *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 946 (W.D. Mich. 2003).

The MUTSA defines "trade secret" as follows:

(d) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws § 445.1902. "For information to constitute a trade secret under Michigan law, the information must (1) derive economic value from the fact that it is not known to others who could make use of it, and (2) be the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410 (6th Cir. 2006) (citing Mich. Comp. Laws § 445.1902(d)); *see also Kelly Servs., Inc. v. Noretto*, 495 F. Supp. 2d 645, 658 (E.D. Mich. 2007) ("Information constitutes a protectable trade secret under the MUTSA if the information derives independent economic

value from not being generally known to others and the employer took reasonable steps to protect the confidentiality of the information."). "[T]he essence of a trade secret is that it derives its value from secrecy . . . ." *Stromback v. New Line Cinema*, 384 F.3d 283, 305 (6th Cir. 2004). Michigan courts consider the following factors in determining if information is a trade secret:

> (1) extent to which information is known outside of owner's business, (2) extent to which information is known by employees and others involved in business, (3) extent of measures taken to guard secrecy of information, (4) value of information to owners and competitors, (5) amount of effort and money expended in developing information, and (6) ease or difficulty with which information could be properly acquired or duplicated by other.

*Dura Global Techs., Inc. v. Magna Donnelly Corp.*, 662 F. Supp. 2d 855, 859 (E.D. Mich. 2009) (quoting *Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612, 626 (E.D. Mich. 2005)); *see also Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 614 (Mich. 1984) (quoting Restatement of Torts, § 757). Information is not a trade secret if it is generally known in the industry, accessible through publicly available sources, or readily ascertainable through other proper means.

To be actionable, there must be a "misappropriation" of the trade secret. "Misappropriation" is defined in the MUTSA as follows:

(b) "Misappropriation" means either of the following:

(i) **Acquisition** of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by **improper means**.

(ii) **Disclosure or use** of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

> (A) **Used improper means to acquire** knowledge of the trade secret.
> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized **improper means to acquire** it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.
> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Mich. Comp. Laws § 445.1902 (emphasis added).

Mark Davis, the current director of engineering for commercial vehicle applications and products at Dana (Davis, Tr. 112), testified on behalf of Dana. Davis testified that the Dana information taken by the individual defendants included files concerning each of Dana's four categories of axles – medium-duty, line-haul, heavy-duty, and specialty – and dealt with all components of those axles, including housings, gears, bearings, the power dividers, and wheel diff. (Davis, Tr. 120.) The files contained information on gear ratios, gear geometry, drawings, forgings, finishes, and man hours. (Davis, Tr. 120-21.) They also included information regarding design solutions, improvements, development concepts, testing, gear development, pricing, and costs. It is generally understood that such information is proprietary in nature and would constitute a company's trade secrets. *See*, *e.g.*, *Veteran Med. Prods., Inc. v. Bionix Dev. Corp.*, 1:05-CV-655, 2008 WL 696546 (W.D. Mich. Mar. 13, 2008) (Brenneman, M.J.) (noting that manufacturing costs and production forecasts are not generally known or readily ascertainable, and would have value to a competitor). Davis estimated that 30-50% of the files downloaded by Adleman were

proprietary to Dana. (Davis, Tr. 125.) The individual defendants acknowledged that some of the files they downloaded contained Dana's confidential and proprietary information. (Wenstrup, Tr. 415, 558; Turner, Tr. 341; Adleman, Tr. 277.)

It is clear that some of the information taken by the individual defendants from Dana constitutes trade secrets, but not to the extent suggested by Dana. "[T]he general knowledge of an employee does not constitute a trade secret." *Lowry Holding Co., Inc. v. Geroco Tech Holding Corp.*, No. 303694, 2012 WL 1890231, at *3 (Mich. Ct. App. 2012). The concept of misappropriation of trade secrets "must not compromise the right of employees to change jobs." *Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 535 (6th Cir. 2008); *see also Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 617 (Mich. 1984) (noting that the public policy of Michigan is to protect and encourage the right of the individual to pursue his livelihood in the vocation he chooses, including the right to migrate from one job to another). Accordingly, to establish a trade-secrets claim, the party "must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets." *Id*. (quoting *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 813 (Mich. Ct. App. 2002)).

Information is also not a trade secret if the company does not use reasonable measures to maintain its secrecy.

> "Sufficient measures" taken to protect the secrecy of confidential information as a "trade secret" under MUTSA have been found to include "either an express agreement between the employer and employee restricting or prohibiting disclosure by the latter to third parties; a disclosure by employer

to employee in confidence or with a tacit understanding, inferable from the attendant circumstances, that the information is confidential; or security precautions utilized by the employer to insure that only a limited number of authorized individuals have access to the information."

*Veteran Med. Prods.*, 2008 WL 696546, at *3 (quoting *Wysong*, 412 F. Supp.2d at 626. Use of non-disclosure agreements, using password and log-in protections, and limiting access to data constitute reasonable measures to maintain the secrecy of trade secrets. *Veteran Med.*, 2008 WL 696546, at *8; *Kelly Servs v. Noretto*, 495 F. Supp. 2d 645, 658 (E.D. Mich. 2007).

## 1. **Trade Secrets**

Dana asserts that Defendants used Dana's confidential trade secret information in the areas of testing, development of the 40K axle, product improvement, gear development, and pricing and cost, all in an effort to develop competitive products. Dana also asserts that the Eaton Engineering Data Book was a trade secret.

(a) Eaton Engineering Data Book

The Court concludes that the Eaton Engineering Data Book does not qualify as a trade secret. The Engineering Data Book contains information on all of Dana's commercial drive axle products. (Gerlach, Tr. 912; Ex. 198.) It is a looseleaf document that is constantly updated. (Davis, Tr. 122.) The purpose of the Engineering Data Book is primarily to enable Dana's application engineers to work with Dana's customers, original equipment manufacturers (OEMs) that build trucks using Dana components, so that they can engineer in Dana products. (Davis, Tr. 122.)

Davis testified that the Engineering Data Book is solely for the use by the OEMs and Dana's internal application engineers, and that Dana does not publish it on the internet or distribute it randomly. (Davis, Tr. 123.) Regardless of what Dana may have intended, Dana did not take care to maintain the confidentiality of the Engineering Data Book. In practice, the contents of the Engineering Data Book were widely shared without any regard to confidentiality. The Data Book was prepared for use by non-Dana users, and there is no evidence that Dana kept a record of such non-Dana users, or that the non-Dana users were required to agree to keep the information confidential. (Wenstrup, Tr. 501-507). From 2005 to 2009, substantial portions of the information in the Engineering Data Book was publicly available online at the Roadranger.com website. (Gerlach, Tr. 913; Wenstrup, Tr. 506.) Gerlach did not consider the information in the Engineering Data Book to be confidential; he believed it fell within the scope of what Dana employees were able to share. (Gerlach, Tr. 913.) Gerlach, through his work in Dana's technical support center, would regularly fax or email copies of pages from the Engineering Data Book to anyone who called the Roadranger 800 number with questions about Dana axles, including direct customers (the OEMs), their customers, such as dealerships and large fleets, repair shops, and end users, such as truck owners. (Gerlach, Tr. 913-15.) Dana also permitted both Gerlach and Wenstrup, upon their terminations in April 2009, to take their copies of the Engineering Data Book. (Wenstrup, Tr. 498-500; Gerlach, Tr. 911-912.) Because Dana did not take sufficient steps to preserve the confidentiality of the information in the Engineering Data Book, the

Engineering Data Book was not a trade secret.

(b) <u>Testing</u>

Dana asserts that Wenstrup disclosed confidential testing information.  In support of this contention, Dana refers to the following emails.  On July 19, 2010, Wenstrup sent the following email to Turner:

> Please review this spreadsheet which is my recollection of the tests run on new axle development projects.  It is a combination of hvy tandem and med single tests.  Can you review and add tests I missed?

(Ex. 222.)  After Turner responded with some additions, Wenstrup sent the following email to Orozco and Platt:

> Here is a list of tests I am familiar with running as part of the development of a new commercial axles.  This includes tests for both forward and rear axle as well as noise sensitive applications which may not always apply but this will give a template for test we should consider when developing axles in the future.

(Ex. 73.)  Wenstrup admitted that the chart disclosed one or two component elements from Dana's protocols for some of its tests that he recalled from memory.  (Wenstrup, Tr. 519.)  He also admitted that these test parameters were not available on a public website.  (Wenstrup, Tr. 573.)  He only provided a couple parameters in order to identify the tests, and did not disclose adequate information to duplicate the tests.  (Wenstrup, Tr. 520-23.)  Orozco testified that it was merely a generic list of tests with minor details and descriptions to identify what the test were, but no test protocols or anything of significance.  (Orozco, Tr. 868.) Turner confirmed that there was insufficient data identified to run any of the tests.

(Turner, Tr. 358-59.) Turner and Platt confirmed that the same or similar tests are used by every axle manufacturer. (Turner, Tr. 358-59; Platt Dep. 78-82.) Platt also testified that Wenstrup's email (Ex. 73) was so general that it probably would not have influenced him. (Platt Dep. 78-82.)

It appears that the tests fall within the scope of general knowledge gained in the course of Wenstrup and Turner's professional experience. Wenstrup had spent his entire 30-year career in the commercial axle field. The fact that all of his experience came from Dana does not make all of his knowledge and experience confidential or off limits. His engineering experience included his knowledge of what tests are used. Even though Dana does not publish its tests, Dana has not presented evidence that any of the tests listed in Wenstrup's email were unique to Dana, or that there was an understanding that any identification of a specific test was subject to secrecy. The Court finds that Wenstrup's naming of the tests from memory and his identification of the tests by naming a couple of parameters was not secret. If the scope of protectable of trade secrets were as comprehensive as Dana suggests, no engineer would be able to accept a job with a competitor without fear that any stray comments about their past experience would expose them to a legal action.

Dana claims that Wenstrup disclosed more in the area of testing that what was identified in the email. Dana contends that American Axle had no commercial vehicle testing, and that when it subsequently developed a list of tests, it likely relied on information provided by Wenstrup. Dana bases this assertion on Platt's testimony that in 2008 American

Axle did not have a list of tests that it would run for commercial vehicles. (Platt Dep. 79.) Dana's argument does not follow from Platt's testimony. Platt only addressed the state of affairs in 2008. Wenstrup was not hired until 2010. Platt further testified that the list of tests was created in the Fort Wayne office, probably by Mike Follis and Ed Stuart, and that he did not recall Wenstrup having any input into American Axle's testing protocol. (Platt Dep. 79.) Platt's testimony does not cast doubt on Wenstrup's testimony that when he sent the email about a list of tests in July 2010, American Axle had its own testing procedures and did not implement the protocols identified by Wenstrup and Turner. (Wenstrup, Tr. 424.) The unrebutted evidence is that none of the axle tests summarized by Wenstrup were adopted by American Axle. (Wenstrup, Tr. 519-20, 523; Turner, Tr. 359.) Dana's assertion that Wenstrup disclosed additional trade secret testing information that was used by American Axle is based on speculation, not facts.

Dana's additional claims that Wenstrup disclosed trade secret testing fail for similar reasons. In an email dated February 23, 2010, responding to Platt's proposal for the Volvo medium duty (Euro 6) Axles, Wenstrup stated as follows:

> At 36T, what would be the dyno torq. and min. B10 cycle life? For 36T / 80K CGW, I would expect dyno torq. to be around 19,000 ft-lbs. which is just scary for a 380 mm. ring gear. Are the brgs. up to this GCW rating?

(Ex. 22.) Wenstrup acknowledged that his expectations on torque values were based on his experience at Dana. (Wenstrup, Tr. 396.) He also indicated that these are the same torque values used at American Axle. (*Id.*) It is not surprising that he would have engineering

discussions on torque values. These are engineering principles he learned during his professional life. He cannot be expected to ignore what he learned.

In an email dated July 22, 2010, Wenstrup discussed Dana's impact machines. Wenstrup acknowledged that this was information that Dana does not publish to the public. (Wenstrup, Tr. 422-23, Ex. 77.) However, aside from showing that it was not published, Dana did not present any evidence to suggest that this was information that derived economic value from the fact that it is not known, or was the subject of efforts to maintain its secrecy. *See Mike's Train House*, 472 F.3d at 410. Thus, this information does not constitute a trade secret.

On August 1, 2011, in an email string relating to a commercial vehicle test specification, Wenstrup asked, "Why do we only go to a min load of 4,400 Kg? In the world I came from, we were using a number more like 200Kg." (Wenstrup, Tr. 465-66; Ex. 1384.) The world Wenstrup came from was his 30 years at Dana. It is also his 30 years of experience in engineering. Wenstrup explained that American Axle had two different tests, one for Albion and one for Mack, and he was attempting to get American Axle to adopt a consistent test for both the Mack product and the Albion product. (Wenstrup, Tr. 465-66.) He also explained in the email the engineering considerations in setting a minimum load and his concerns regarding the higher number. (Ex. 1384.)

Dana argues that when this email is placed in the context of the volumes of testing documents removed, such as DVP&R files, DFMEA files, and DOE Supertruck Power Point,

there can be no doubt that Wenstrup used Dana's trade secrets while an employee of and for the benefit of American Axle.

The Court finds no merit to Dana's argument. Wenstrup's discussion in the August 1, 2011, email is essentially an engineering discussion about general engineering principles he learned during his 30 years at Dana. Moreover, there is no reason to view this email in the context of the "volumes of testing documents" that were copied by defendants because there is no evidence that those volumes of testing documents were accessed or used.

The Court finds that Dana has not shown that Wenstrup (or any of the Defendants) disclosed or used any secret testing information.

(c) Development of the 40K Axle

Dana asserts that Wenstrup disclosed confidential trade secret information concerning development of the 40K axle. In support of this assertion, Dana presented evidence that Orozco, Wenstrup's immediate supervisor at American Axle, asked Wenstrup, who had been chief engineer in the development of Dana's 40K axles, what it would take to develop the 15.3 tandem. (Ex. 24.) The 15.3 tandem is comparable to the Dana 170/190 40K. (Wenstrup, Tr. 394.) Wenstrup responded with an estimate of the resources expended in developing heavy axles at Dana, including the number of man-years (27.7), divided between engineers (17.2), CAD (5), and techs (5.5). (Ex. 24; Wenstrup, Tr. 399.) Wenstrup testified that the numbers he gave were estimates based on his memory of the resources used by Dana in 2003 to 2005, more than five years before. (Wenstrup, Tr. 400-01.) Orozco testified that

he did not believe this was trade secret, confidential, or proprietary information because it was only a crude approximation. Furthermore, his only purpose for asking for the information was to try to convince his supervisor to provide additional resources during a difficult economic climate. (Orozco, Tr. 846-48.) Davis testified that the number of man-hours used is information Dana would not want to share because it is "proprietary to our process and how we design and develop products," and one with access to that information could understand Dana's cost structure, time to develop products, and available resources. (Davis, Tr. 121.) Davis has overstated the use a competitor could make of Wenstrup's rough estimate. Dana has not persuaded the Court that this crude approximation constituted a trade secret.

Dana notes that American Axle included Turner and Adleman on discussions relating to the 40K development. (Ex. 87, email requesting that Turner and Adleman be provided access to program files for the 40K development; Wenstrup, Tr. 468; Ex. 194, at 253, note in Wenstrup's engineering journal to "set up DFMEA review with Gary [Turner] and Jake [Adleman]."); Exs. 91, 300, 333, including Turner in email discussions regarding design and development of the 15.3 axles.)

The hiring of individuals with expertise in a certain area is not sufficient to show that those individuals used confidential information. None of the individuals had a covenant not to compete with Dana. Moreover, Turner testified that his receipt of emails relating to the 15.3 or other non-Mack projects did not result in his doing any engineering work on those

projects. (Turner, Tr. 355.) Dana has not shown by a preponderance of the evidence that Defendants used or disclosed confidential trade secret information relating to development of the 40K axle.

(d) <u>Product Improvement Information</u>

Dana asserts that the individual defendants disclosed Dana's confidential product improvement information. Dana has presented evidence that Adleman attended a May 4, 2010, meeting relating to axle redesign where a suggestion was made to use powdered metal on an IAD spider. (Ex. 382.) Dana suggests that because one of the design failure DVP&R's removed by Adleman included testing the use of powdered metal on the IAD spider (Davis, Tr. 132; Ex. 254), American Axle's discussion of using powdered metal is evidence that Adleman or Wenstrup disclosed this confidential information. Adleman testified that the meeting occurred on his second day at American Axle and that the suggestions were not his. His role at the meeting was to meet other American Axle employees and to take notes because he was "the lowest man on the totem pole." (Adleman, Tr. 274-75.) Wenstrup testified that the idea of using powdered metal originated in 1992, and came from a supplier for Dana's 404 axle. (Wenstrup, Tr. 480.) Although Dana has shown that it used powdered metal, Dana has not shown that using powdered metal was a concept unique to Dana, that it was not known in the industry, or that it was a concept that Dana or its supplier kept secret or confidential. The Court does not have sufficient evidence to support a finding that the use of powdered metal was a trade secret.

Dana presented evidence that in an email dated May 5, 2010, Wenstrup stated that "from his experience" reducing the banjo housing wall thickness to 14 mm "should be worth about $30/axle in cost." (Ex. 56.) Wenstrup's engineering notes for May 3, 2010, show costs for 5 axle wall thicknesses. (Ex. 194, at 72.) Although Dana has not presented evidence challenging Wenstrup's testimony that the wall thicknesses reflected in the email and in his engineering journal notes are not unique to Dana (Wenstrup, Tr. 570), Dana notes that one of the documents Wenstrup removed from Dana was a 35-page 2006 Dana Volvo pricing matrix that included information about the housing wall thickness option on a certain Dana axle, the optional materials, and the prices and materials used in some Dana parts. (Ex. 188AE; Davis, Tr. 154-55.) Davis testified that the information in the pricing document could be useful to a competitor because the competitor would have the information necessary to enable it to underbid Dana.

Davis testified to the trade-secret status of the entire pricing document. However, there was no showing that the pricing document was accessed after February 2010, there was no showing that it was copied or printed, and there was no showing that American Axle used any information from the 2006 Volvo pricing matrix in any way. The Court is not persuaded that the isolated statements in Wenstrup's email were trade secrets, and Dana has not attempted to refute Wenstrup's assertion that he disclosed nothing more than publicly-known wall thicknesses.

Dana contends that Wenstrup again disclosed design improvements undertaken at

Dana in a July 21, 2010, email summarizing proposed housing and flange design modifications. (Ex. 75.) Wenstrup testified that although these improvements were made at Dana, they were also the subject of a 1954 patent. (Wenstrup, Tr. 483.) Dana faults Defendants for failing to produce corroborating documentation. However, Dana has the burden, in the first instance, to show that a particular piece of information is a trade secret. Dana has not met its burden. Dana has not shown that the improvements were unique to Dana or that they were kept secret.

Dana presented evidence that in a June 7, 2010, email Wenstrup stated "[w]e found that ratios deeper than 5:1 were very susceptible to score if not Lubrited." (Ex. 78) Wenstrup admitted that this was a statement of what he learned at Dana, (Wenstrup, Tr. 485), but contends that this falls within the realm of general engineering knowledge. Dana contends that if it was in fact general engineering knowledge, Wenstrup should not have had to explain it to a fellow engineer. Dana interprets general engineering knowledge too narrowly. General engineering knowledge is not only what is learned in engineering school. General engineering knowledge includes what is learned on the job regarding what might cause gear failures. Dana has not shown that the kind of information shared in the June 7 email was subject to secrecy.

In an email discussion on the 18" drivehead for a bus application in China, Wenstrup stated that "[p]revious experience shows diff. takes a beating in a bus application," that the spider should be lubrited, and that nickel plating was used in abusive diff. applications. (Ex.

136.)  He further stated that the carrier to housing joint should be reviewed, and that "[c]ompetitive carriers thicken flange at these locations to increase bolt stretch."  (Ex. 136.) Dana contends that this email discloses Dana's confidential product improvement information.  Wenstrup does not deny learning this information at Dana, but he testified that everybody in the industry lubrites the spider, and using nickel plating on the differential to improve spinoff performance was information he learned from GM as part of a product GM sold to Dana.  (Wenstrup, Tr. 453-54.)  He testified that the recommendation to thicken flanges was the subject of several field bulletins issued by Dana to educate the industry on the problem.  (*Id.* at 454.)  There is no showing that Wenstrup disclosed the details of Dana's improvements, and best engineering practices do not become confidential merely because the practices were used at Dana.  Dana has not shown that this email contains anything more than general engineering information,

In a November 4, 2010, email, Wenstrup attached a design idea for a Volvo Asia Truck program.  (Ex. 133.)  Dana contends that his idea used the same material changes and design structures implemented by Dana as one of its top ten VA/VE projects.  (Ex. 188V.) Dana provided no testimony as to what was secret about the information in this email or how the information was protected.

On June 11, 2011, in response to Turner's summary of a conference call regarding the Mack differential bearing project, Wenstrup wrote:

> As you know, a large reason for using the fixed curvic clutch with diff lock was to pursue I.H. ductile iron on the diff. case v. today's H.T. steel

34

construction. I would estimate savings to be in the $25-$40/axle (w diff lock). Is Matt open to pursuing a ductile iron case with current spline/clutch design? John if not, how to [sic] we report this lost costs savings opportunity to Mack purchasing?

(Ex. 344.)

Dana contends that such cost savings measures are the type found in the Engineering Cost Estimate Request Matrix 5-10-0.pdf, which was one of the documents Wenstrup took from Dana and accessed in February 2010. (Ex. 188V.) Wenstrup testified that the idea of using ductile iron came from a diff lock that American Axle had benchmarked in 2008, before Wenstrup was at American Axle, and that the cost savings estimate was based on his industry experience that ductile iron is cheaper than cast iron, a matter which is generally known. (Wenstrup, Tr. 475-77.) Dana has not provided sufficient evidence that the information in Wenstrup's June 11, 2011, email was Dana's trade secret information.

Dana has not shown by a preponderance of the evidence that Defendants used or disclosed Dana's confidential or trade secret product improvement information.

(e) Gear Development Information

Dana asserts that Wenstrup disclosed confidential gear development information. Wenstrup admitted accessing Dana's Set-gear & Pinion Chart (Ex. 212). Of the ten documents Wenstrup opened, the Set-gear and Pinion Chart is the only document Wenstrup acknowledges using. (Wenstrup, Tr. 415-49, 447-49, 524-28, 530-32, 534-48.) Davis testified that a competitor who obtains Dana's trade secret gear information would save considerable time and expense as gear development takes three to four years and Dana

expends approximately $8 million a year on such projects. (Davis, Tr. 138-39.) Teh Court is satisfied that the Set-Gear and Pinion Chart is a confidential or trade secret document.

Wenstrup testified that he only opened the document to count the gear ratios for a line of Dana commercial axle products so that he could incorporate that information in a February 24, 2010, email. (Ex. 24; Ex. 212; Wenstrup, Tr. 536.) The gear ratio information, however, is not a confidential trade secret because it is publicly available on the Roadranger.com website. (Wenstrup, Tr. 536-39; Ex. 1447, Roadranger Specification Guide.)

Dana accuses Wenstrup of disclosing gear forging materials because Wenstrup twice suggested that American Axle use 20 magnesium chromide 5 (20MnCr5) for Volvo Asia and Volvo Mack products as a cost savings measures. (Wenstrup, Tr. 433-44; Ex. 159).Wenstrup testified that the use of 20 McCr5 is not a trade secret because 20MnCr5 is a standard material known in the industry for years, and not unique to Dana. (Wenstrup, Tr. 532.) Dana does not contest this testimony. Instead, Dana points to Davis's testimony that forging materials are confidential, that the compilation of all of its gearing materials is not publicly known, (Davis, Tr. 135), and to the fact that the Forging Material Chart (Ex. 3) was one of the documents on Wenstrup's MyBook.

The Forging Material Chart was one of the documents accessed on January 26, 2010, but even Dana's computer expert could not confirm that it was accessed by a human rather than a program. (Hendricks, Tr. 70, 83; Ripa, Tr. 723-24.) Moreover, there is no evidence that the Forging Material Chart was ever disclosed or used at American Axle. Dana has

attempted to blur the distinction between the generic information that was disclosed or used with the trade secret information that was downloaded.

Dana has not shown by a preponderance of the evidence that Defendants used or disclosed Dana's confidential or trade secret gear development information.

(f)  Pricing and Cost Information

Dana asserts that Wenstrup disclosed Dana's confidential pricing and cost information.  Dana has presented evidence that on February 17, 2010, the same day that Wenstrup was invited to attend a Hino quote meeting, Wenstrup accessed Dana's Hino pro forma chart.  (Wenstrup, Tr. 404; Ex. 188X.)  The Hino pro forma chart describes margins used in 2006 by Dana to determine the prices to bid on Hino work.  Having a competitor's bid is a valuable guide to where a product needs to be priced in order to obtain the business, and despite the passage of time, the information is not obsolete because material indices can be used to account for changes in the cost of commodities.  (Ex. 39; Davis, Tr. 152-54, 189-93, 198-201; Wenstrup, Tr. 405.)  Dana has shown that Wenstrup accessed the trade secret Hino pro forma on February 17, 2010.

In a March 11, 2010, email to his supervisor, Wenstrup stated:  "Here is first pass at Ankai gear development program timing . . . My costs are based on a quote for tooling from Gleason with 25% premium for expediting . . . Tooling costs and expedited freight are guesses based on past experience."  (Ex. 31.)  Wenstrup testified that he provided the information on lines 9-12 of the chart attached to the email, which are the costs associated

with raw materials: pinion forging tool ($15,000), gear forging tool ($15,000), pinion forging - 100 pcs ($5,000), and gear forging - 100 pcs ($7,500). (Wenstrup, Tr. 459.) Dana asserts that its tooling costs and freight costs are not publicly known. However, although Dana provided testimony that costs are generally subject to confidentiality, Dana provided no testimony that the limited information actually disclosed in this email was information that derived economic value from the fact that it is not known, or that it was the subject of efforts to maintain its secrecy. *See Mike's Train House*, 472 F.3d at 410.

On October 27, 2010, Wenstrup sent an email with a cost breakdown for American Axle's 40K tandem axle at two different profit margins. (Ex. 98.) Dana contends that the information on costs came from a confidential Dana pricing document downloaded by Wenstrup and accessed by him in February 2010. Dana points out that the $3,000 price on Wenstrup's email is close to the $2,960 price on the DD404P model reflected on the Dana pricing sheet. (Ex. 188Z.) Wenstrup testified that the cost information came from John Matton, not from the Dana pricing document. (Wenstrup, Tr. 415.) Wenstrup also testified that Dana's attempt to show a similarity in the cost figures was a comparison of apples to oranges. (Wenstrup, Tr. 410, 525-28.) The Dana pricing sheet was 4 years old, and the comparison axle was not similar because it had an optional diff lock, an optional wheel diff lock, and an optional pump, while Wenstrup's $3,000 price estimate was for a stripped down axle. (Wenstrup, Tr. 526-27.) Wenstrup testified that the axle he discussed in his October 2010 email was more similar to the Dana DS404, which had a price of $2,350. (*Id.* at 525-

28.) The pricing document was accessed only once, in February 2010, and was too detailed to be recalled ten months later. Moreover, Dana has not convinced the Court that it was comparing similar products.

On December 23, 2010, Wenstrup sent an email confirming that estimated prices for components discussed at a Daimler banjo housing business case review "work out pretty close to numbers I remember for similar housing configurations." (Ex. 122.) Wenstrup admits that he was relying on his experience at Dana. (Wenstrup, Tr. 416, 464.) Manufacturing costs are confidential. (Gerlach, Tr. 923-24.) Nevertheless, Wenstrup's mere confirmation that American Axle's estimated prices were close to what he recalled from Dana is an application of general knowledge rather than the disclosure or use of trade secret information.

Dana has not shown by a preponderance of the evidence that Wenstrup (or any other Defendant) used or disclosed Dana's confidential or trade secret pricing or cost information.

(g) <u>Other Information</u>

In a November 24, 2011, email, Wenstrup disclosed to John Coster, manager of the procurement group at American Axle, that Sypris was Dana's sole supplier for axle shafts. (Ex. 183; Wenstrup, Tr. 435.) Although Dana contends that this information was confidential, Dana has made no showing that the information was confidential, that it had independent economic value, or that Dana used reasonable efforts to maintain the identity of its supplier as a secret. Wenstrup disclosed this information because American Axle was

sourcing one hundred percent of its Mack axle shafts to Sypris, and Wenstrup had been asked if there were other suppliers besides Sypris that American Axle might deal with. Information that Sypris was Dana's sole supplier was information that was available on the internet. (Wenstrup, Tr. 436.) It had been discussed in the public record in an article concerning the terms of Dana's sale of its axle shaft plant in Marion Ohio to Sypris. (Wenstrup, Tr. 528-29.) Moreover, Sofia confirmed that it is well known in the industry that Sypris supplies Dana. (Sofia, Tr. 802-03.)

### 2. **Misappropriation**

Based upon the discussion above, the Court finds that some of the Dana information downloaded by Turner, Adleman, and Wenstrup is properly characterized as trade secrets. This includes, without limitation, the Price Matrix Index (Ex. 188AE), the Engineering Cost Estimate Request Matrix 5-10-0.pdf (Ex. 188V), the Hino pro forma chart (Ex. 188X), and the Dana Pricing Sheet (Ex. 188Z). However, to prevail on its MUTSA claim, Dana must also show misappropriation.

The parties appear to be in agreement that to state a claim for misappropriation, Dana must show either that Defendants acquired its trade secrets by improper means, or that Defendants used or disclosed the trade secrets.[4] *See Sys. 4, Inc. v. Landis & Gyr, Inc.*, 8 F.

_____

[4]This Court has reservations about applying the acquisition prong, § 1902(b)(i), to the individual defendants. Subsection (b)(1) requires that the secret be acquired by a person "who knows or has reason to know" it was acquired by improper means. Because "improper means" requires intentional conduct, the addition of "knows or has reason to know" suggests

(continued...)

App'x 196, 200 (4th Cir. 2001) ("[A] plaintiff can state a claim for misappropriation simply by demonstrating that the defendant acquired its trade secret by improper means, even if the plaintiff cannot show use of that trade secret.") (interpreting the Maryland UTSA); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 750 (2d Cir. 1998) ("[A] violation of CUTSA occurs only if the defendant either wrongfully acquired the plaintiff's trade secret or used or disclosed the trade secret.") (interpreting the Connecticut UTSA).

(a) Acquisition by Improper Means

Acquisition of Dana's secret information alone is not sufficient for a MUTSA violation. For liability to attach under the acquisition prong, MUTSA requires acquisition by "improper means." Mich. Comp. Laws § 1902(b)(i). "'Improper means' includes theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means." Mich. Comp. Laws § 445.1902(a).

_____

[4](...continued)
that subsection (b)(1) applies to a person who obtains the secret from the one who improperly acquired it. Moreover, if the mere acquisition by improper means is sufficient to constitute a violation of the MUTSA, there would be no need for subsection (b)(ii)(A), which prohibits the disclosure and use by a person who used improper means to acquire the trade secret. The cases that have interpreted the UTSA to require acquisition or disclosure or use have not addressed the application of subsection (b)(i) to the one improperly acquires the information in the first instance. *See Sys. 4, Inc. v. Landis & Gyr, Inc.*, 8 F. App'x 196, 200 (4th Cir. 2001) (involving a suit against the company that acquired the information from its employee, and not against the employee who acquired the information); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 750 (2d Cir. 1998) (finding neither acquisition nor use of a trade secret). Nevertheless, because the Court does not find that any of the defendants acquired the information by improper means, this distinction does not affect the outcome of this proceeding. The Court will accordingly apply subsections (b)(i) and (b)(ii) to all defendants.

While this list is not exhaustive, it generally requires intentional conduct involving some sort of stealth, deception or trickery. *Sys.4*, 8 F. App'x at 200.

(i) Individual Defendants

The evidence does not support a finding that Wenstrup acquired Dana information by theft, bribery, misrepresentation, or any other improper means. Wenstrup acquired the information from his Dana computer with Dana's knowledge, and Dana's IT department even offered to provide him with a copy of his hard drive.

The evidence similarly does not support a finding that Turner and Adleman stole Dana's information, or that they obtained it by stealth, deception, or trickery. Turner and Adleman copied the information while they were employees of Dana. As Davis admitted, Dana had no policy against employees storing Dana information on their personal computers or personal storage devices, or backing up their work computers. (Davis, Tr. 178.) All of the information copied by Adleman and Turner was information which they had authority to access in the normal course of their employment at Dana. (Davis, Tr. 178.) The most Dana has shown is that they violated Dana's Standards of Business Conduct ("Standards") (Ex. 220) by copying and removing the files without an appropriate business purpose. The Court does not find, however, that this impropriety rises to the level of "improper means" as defined by the MUTSA. As evidenced by Dana's conduct when Wenstrup and Gerlach were laid off, Dana had not previously enforced any prohibition against copying Dana files for personal use.

(ii) American Axle

Under MUTSA, misappropriation occurs not only by the person who removes and uses the material but also an employer "who knows or has reason to know that the trade secret was acquired by improper means." Mich. Comp. Laws § 445.1902(b). Dana contends that American Axle is liable for violating the MUTSA because it planned and instigated the coordinated raid on Dana's engineers and data and repeatedly sought and accepted Dana's confidential information. The evidence does not support Dana's contentions.

First, there is no evidence that American Axle used Wenstrup, Turner and Adleman to obtain Dana's trade secrets. Wenstrup was not employed by American Axle until nine months after he left Dana, so he clearly did not act on behalf of American Axle when he copied the Dana files. As to Turner and Adleman, Dana has presented some evidence in support of its suspicion that Turner and Adleman copied files on behalf of American Axle. However, the suspicions were based solely on Turner and Adleman's actions. Turner and Adleman denied that anyone at American Axle asked them to bring Dana information to American Axle or to use such information in their work at American Axle. (Adleman, Tr. 305, Turner, Tr. 365.) Davis corroborated this with his testimony that when he interviewed with American Axle he was not asked for any Dana information. (Davis, Tr. 221, 223.) Sofia and Orozco testified that no such information was requested, that the use of such information would not be tolerated by American Axle policy, and that such information was not known to have been in the individual defendants' possession. (Orozco, Tr. 850; Sofia,

43

Tr. 794-95.) Dana has presented no evidence to the contrary. Dana presented no evidence to suggest that anyone from American Axle encouraged or pressured Turner or Adleman to copy Dana files or that American Axle encouraged or pressured any of the individual defendants to use Dana confidential information at American Axle. For the reasons stated above in connection with the individual defendants, the Court is not persuaded that the individual defendants copied files at the behest of or on behalf of American Axle.

Second, based on the Court's findings with respect to the individual defendants, the Court also finds that Dana has not proved that American Axle acquired any confidential Dana information, much less that it acquired those trade secrets with knowledge that they were improperly acquired. Although the information copied by the individual defendants included trade secrets, there is no evidence that any of the trade secret information was ever acquired by American Axle. There is no evidence that any of the Dana confidential or proprietary information was downloaded onto any of the American Axle computers, and there is no evidence that American Axle ever used any of Dana's confidential information. In fact, the only evidence produced at trial regarding American Axle's reaction to the availability of Dana's information is a clear direction not to use confidential information. (Ex. 1326.) The issue arose when Wenstrup noted in an email to Orozco on April 25, 2010, that he had been asked for an example of a Dana product presentation. Wenstrup indicated that he had found one on his home computer, and asked for Orozco's thoughts on sharing it. Orozco responded that if the presentation had intellectual property that is not of public

44

knowledge Wenstrup could not use it, and that he should call the legal department if he had any doubts. (Ex. 1326.)

The only information Dana has established that American Axle acquired was the information contained in Wenstrup's emails. Even if some of Wenstrup's emails could be viewed as containing trade secrets, there is no showing that American Axle knew or should have known that they were acquired by improper means. First, as noted above, they were not in fact acquired by improper means. Second, even if Wenstrup had acquired the information by improper means, there is nothing in Wenstrup's emails that would have alerted Dana that the information had been acquired by improper means, or that it was information that Wenstrup had a duty to keep secret. Wenstrup's emails indicated that information came from his "experience" or from the "world he comes from." The fact that Wenstrup based his engineering advice on his past experience is not evidence that the information was a trade secret or that it was acquired by improper means. Wenstrup had no covenant not to compete with Dana and was free to use his general engineering knowledge in a job with a competitor.

The evidence presented does not persuade the Court that any of the Defendants acquired Dana information by improper means.

(b) <u>Disclosure or Use</u>

The evidence also does not support a finding that any of the defendants disclosed or used confidential Dana information.

(i) Turner and Adleman

The preponderance of the evidence shows that Turner and Adleman returned all of the Dana information in their possession within three weeks of leaving their employment, and that they did not disclose or use any Dana information. Dana has attempted to show use or disclosure based solely on Adleman's presence at a meeting where powdered metal on an IAD spider was discussed, on Turner's contribution to Wenstrup's list of tests, and on Turner and Adleman's inclusion on emails regarding commercial vehicle axle design. As discussed in Part II(A)(1) above, Dana has not shown that any of these activities constitutes the use or disclosure of trade secrets. Turner and Adleman denied using or disclosing any confidential Dana information and Dana has not presented any evidence sufficient to cast doubt on their testimony. Moreover, as previously noted, Dana had not obtained a covenant not to compete from Turner or Adleman, and they were free to share their general engineering expertise in their new job.

(ii) Wenstrup

Dana has presented some evidence in support of its contention that Wenstrup used or disclosed Dana trade secret information. Specifically, Dana has presented evidence that Wenstrup accessed the trade secret Hino pro forma chart on February 17, 2010, which was the same day Wenstrup was invited to attend a "tentative" "Hino expanded Guidance Quotes CR Kickoff Meeting." (Ex. 19.) Wenstrup's response to the invitation to attend the meeting was tentative. He stated that he was in a manufacturing conference, but that he would try to

call in.  (*Id.*)  Wenstrup does not recall whether he participated in the teleconference. (Wenstrup, Tr. 448.)  Wenstrup denied disclosing any information from the Hino pro forma in his work at American Axle.  (Wenstrup, Tr. 531-32.)  He also testified that the prices quoted by American Axle to Hino were set by American Axle before Wenstrup was hired and the American Axle pricing never changed.  (Wenstrup, Tr. 532.)  Dana has not challenged Wenstrup's testimony and has not produced sufficient evidence to support a finding that Wenstrup attended the meeting, much less that he disclosed or used any confidential information from the Hino pro forma at the meeting.

Dana has also produced evidence that Wenstrup used  the confidential Set-Gear and Pinion Chart.  (Ex. 212.)  As previously noted, although this document qualifies as a trade secret, Dana has made no showing that Wenstrup disclosed anything more from this document that the publicly available gear ratios.  There is no evidence that Wenstrup ever accessed the document after February 2010 or used any additional information from it.

Dana's remaining proofs as to Wenstrup's disclosure or use concern matters that this Court has determined were not trade secrets.  Throughout this case it has been Dana's practice to take one small piece of information from an email or engineering notebook that references the subject matter of one of the trade secret documents taken by the defendants, and then to request the Court to infer that the trade secret documents were disclosed or used.  The Court is not persuaded that such an inference is warranted.  None of the Dana references in Wenstrup's emails signal a greater use of the confidential documents.  The Court finds no

basis for finding that Wenstrup (or any other defendant) made wholesale use of Dana's confidential information. The evidence is simply not sufficient to support this theory.

(iii) American Axle

Dana did not produce any direct evidence that American Axle used any of Dana's trade secrets. Dana contends that even if there is no direct evidence of use, circumstantial evidence may be used to establish the misappropriation of a trade secret under the MUTSA. *Veteran Med.*, 2008 WL 696546, at *9. "[C]ourts may properly consider circumstantial evidence concerning similarity of design plus access to the design to imply use by a defendant of a trade secret." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005) (interpreting the Tennessee UTSA); *see also Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 31 (6th Cir. 2011) (permitting circumstantial evidence to establish use under Kentucky UTSA for purposes of a preliminary injunction). According to Dana, Defendants' admitted theft, coupled with American Axle's efforts to introduce competitive commercial axles, demonstrates misappropriation of Dana's trade secrets.

The circumstantial evidence in this case is not sufficient to establish misappropriation. As previously noted, the Court does not find that Dana's trade secrets were stolen or otherwise improperly acquired by the individual defendants. Not only was use of Dana's confidential information against company policy, but, as Sofia testified, the Dana information was not of particular relevance or importance to American Axle, which had its own history of developing axles, and was competing in a different market. Moreover, Dana has made no

48

showing that American Axle has adopted competitive designs, quotes, tests, or materials that would suggest a use of Dana's trade secrets. The manner in which the evidence was presented tended to blur the distinctions between what was confidential and what was not, what was reasonably protected and what was not, what was used and what was merely downloaded, what was copied and what was returned. Now that the Court has sifted through the evidence, the Court is satisfied that Dana has not presented sufficient circumstantial evidence to establish misappropriation by a preponderance of the evidence.

Dana faults Defendants for failing to come forward with evidence of independent development to support their commercial vehicle axle program. Evidence of independent development may be used to rebut an inference of misappropriation. *See Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 459-60 (6th Cir. 2001); *Kienzle v. Capital Cities/Am. Broad. Co.*, 774 F. Supp. 432, 436 (E.D. Mich. 1991); *Adv. Analytics, Inc. v. Citigroup Global Markets, Inc.*, No. 04-3531, 2009 WL 7133660, at *20 (S.D.N.Y. Aug. 5, 2009). However, because there is insufficient evidence to support an inference of misappropriation, Defendants are not required to produce evidence of independent development.

The Court finds no basis for holding any of the defendants liable under the MUTSA because Dana has not shown acquisition by improper means, nor has Dana shown use or disclosure of any trade secrets.

## B. Breach of Contract

Dana asserts in Counts 2, and 3 that Turner and Adleman breached their contracts with Dana by taking its confidential information without permission and for their personal use and not for any Dana business purpose, and by failing to return that information to Dana. (Dkt. No. 407, Dana's Post-Tr. Mem. 37.) Dana asserts in Count 4 that Wenstrup breached his contract with Dana by disclosing Dana's confidential information.

To establish a breach of contract claim under Michigan law, a plaintiff must prove by a preponderance of the evidence (1) the existence of a valid contract, (2) the terms of the contract, (3) that defendant breached the contract, and (4) that the breach caused the plaintiff injury. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003).

Dana bases its breach of contract claims on the Employee Agreements signed by Turner, Adleman, and Wenstrup (Exs. 5, 10, 191), the Acknowledgement Agreements signed by Turner and Adleman (Exs. 45, 49), the Dana Standards of Business Conduct ("Standards") (Ex. 220), and the Dana IT policy (Ex. 221).

As a preliminary matter, the Court notes that neither the Standards nor the IT Policy provide the basis for a breach of contract action. The Standards exhort Dana employees to conduct Dana's business in a "legal, ethical and responsible manner," and address topics including workplace safety, protection of the environment, accurate record keeping, insider trading, gifts, conflicts of interest, and public relations. (Ex. 220.) The Standards were adopted by Dana's Board of Directors in 2008, after the individual defendants were

employed. The Standards provide that "any Dana employee who is found to have violated these Standards . . . or who refuses to acknowledge his or her willingness to comply with these Standards, can expect disciplinary action up to and including termination . . . ." (Ex. 220, at 1.)

The Standards certainly governed Defendants' employment while they were at Dana, and violation of the Standards might have formed the basis for an employment action against them. Nevertheless, the Standards do not provide the basis for a breach of contract action because they do not constitute a valid enforceable contract. They are not signed by Defendants, there is no mutuality of agreement, and the terms of the contract are too vague. *See Detroit Trust Co. v. Struggles*, 286 N.W. 844, 846 (Mich. 1939) (citing *John v. Douglas*, 274 N.W. 780, 784 (Mich. 1937) (holding that the essentials of a valid contract are parties competent to contract, a proper subject-matter, a legal consideration, mutuality of agreement, and mutuality of obligation)).

Like the Standards, the IT Policy is also a set of work guidelines rather than a contract. It was not signed by the individual defendants, and similarly provides, under "Enforcement," that "[a]ny breach of these requirements will be considered a very serious matter and may result in disciplinary action including, in some cases, dismissal." (Ex. 221, at 5.)

Because the Standards and IT Policy are not enforceable contracts, the individual defendants are entitled to judgment on Dana's breach of contract claim to the extent that it

is based on their breach of the Standards[5] and the IT Policy.[6]

Accordingly, Dana's breach of contract claim is limited to the Employee Agreements and the Acknowledgement Agreements.

The Employee Agreements signed by Turner and Adleman provide:

> I further agree that I will not, either during or any time after my employment by Dana, **use or disclose** to any third party any **confidential information** including, without limitation, technical, financial, marketing, and other business information known to or created by me as a result of my employment

---

[5]Dana has asserted that the individual defendants breached the following provision of the Standards by copying Dana information for non-business purposes:

> Dana people have the responsibility to protect Dana's physical assets from theft, misuse and abuse. Likewise any public or non-public information, including technology and intellectual property, owned by Dana or entrusted to us by our business partners, customers and suppliers, should be properly protected, handled on a strict need-to-know basis, and **only used for appropriate business purposes**.

(Ex. 220, at 3 (emphasis added).)

[6]Dana has asserted that Turner and Adleman breached the following provision of the IT Policy by failing to return all Dana files "on the termination of [their] employment":

> **All files and information on your company computer must be delivered to us on the termination of your employment** or at any time upon our request, including any personal files. This includes information you have created or stored on your PC, or on other equipment, whether during or outside of normal office hours. Any duplicate **copies that are not returned** to us must be **deleted or destroyed**.

(Exhibit 221, at 2 (emphasis added).) The IT Policy was adopted in November 2002, and revised in January 2010 (Ex. 221, at 6), after Wenstrup had left Dana. Only the revised policy was introduced as evidence, and Dana does not assert that Wenstrup breached the IT Policy.

by Dana.

(Exs. 5, 10 (emphasis added).)  Wenstrup's Employee Agreement contains a similar provision:

> Unless I shall first secure written consent of [Dana], I shall not **disclose or use** at any time either during or subsequent to my employment, except as required in my duties to [Dana] any **secret or confidential information** of [Dana] which I have acquired during said employment, whether or not developed by me.

(Ex. 191 (emphasis added).)

When Turner and Adleman left their employment at Dana, they each signed an Acknowledgement Agreement ("Acknowledgement"), which provided in pertinent part that they reviewed the terms of their Employee Agreement, and further provided:

> I certify that I understand my obligations pursuant to that Agreement to maintain the confidentiality of trade secrets and other confidential information of Dana.  I further Certify that I have honored these obligations and I have not and **will not disclose** to anyone outside of Dana **or use trade secrets and confidential information** of Dana. I also understand that such information may be contained in documents, computer files or disks, or in my own head.
>
> I also promise that I will review my personal and home files, including computer files and disks, and **promptly return** to Dana any confidential or proprietary information that I may discover in my possession.

(Exs. 45, 49 (emphasis added).)

## 1. **Turner**

Dana contends that Turner breached his Acknowledgement by failing to return a USB device that was plugged into his Dana computer on March 16, 2010, and by failing to promptly return other Dana information.

Dana presented evidence that on March 16, 2010, five weeks before Turner left Dana, a flash drive was connected to Turner's Dana computer. This flash drive was not turned over to Dana during discovery.

Turner testified that he turned over to Dana all USB devices in his possession. Turner does not know who inserted the flash drive into his computer. (Turner, Tr. 362.) Turner testified that USB devices were used extensively at Dana to share files. Participants in program review meetings and engineering meetings, who included engineers, program manufacturers, and representatives from purchasing or manufacturing, would frequently bring information to be discussed on USB drives because the USB drives could be installed in a computer that was connected to a projection system. (Turner, Tr. 362-64.) Turner had a laptop, so in many cases, he would bring his computer to connect it to the projector. (*Id.* at 364.) Dana did not have a system for identifying which employees used which USB device. (*Id.* at 365.) Hendricks did not know whether the unaccounted for flash drive belonged to Turner or to one of his Dana co-workers. (Hendricks, Tr. 79.) The evidence presented does not convince the Court that Turner failed to return any Dana information.

Turner resigned on April 23, and returned the downloaded information six days later, on April 29. Dana contends that because Turner did not return the data until after Dana contacted him seeking its return, he did not return the data "promptly" as required by the Acknowledgement Agreement.

There is no suggestion that Turner or Adleman was aware of any requirement to return

Dana materials promptly until the day they resigned. The Employee Agreement only prevented them from using or disclosing information, and the IT Policy suggested that copies did not have to be returned as long as they were destroyed.

Davis, Dana's spokesperson at trial, admitted that "promptly" is not defined in the Acknowledgement Agreement. (Davis, Tr. 182-84.) According to Davis, what constituted the prompt return of information was a matter left to the departing employee's discretion. (Davis, Tr. 180-81.) Kristen Nowak, Dana's HR director, and Janie Sre, Dana's HR coordinator for the heavy vehicle division in Kalamazoo, conducted portions of Turner's exit interview. (Nowak Dep. 9, 68-72; Sre Dep. 15, 64-68.) Nowak, who gave Turner the Acknowledgement Agreement to sign, did not give Turner a date by which he needed to return information. (Nowak Dep.72.) Nowak had never used the Acknowledgement Agreement prior to Turner's exit interview and had not been given any training or direction on how to collect the documents or equipment during an exit interview. (*Id.* at 47, 68.) She did not feel qualified to interpret what Dana meant by prompt, but thought it was a "reasonable time period." (*Id.* at 72) She testified that the return of documents within two or three weeks would probably qualify as prompt, but conceded that the period could be lengthened if an employee was out of town or otherwise unable to return the documents. (*Id.* at 50-51, 72.) Sre was similarly unaware of any Dana procedure for how departing employees were to isolate and return any computer files on their personal computers. (Sre Dep. 107-08.) Sre contacted Turner on April 28, at Nowak's direction, to request him to

return the missing flash drive.  (*Id.* at 76.)

Turner returned the flash drive on April 29.  Given the lack of clarity regarding the expectations on how and when the information should be returned, the Court finds no basis for finding a breach of the Acknowledgement Agreement based on the timing of Turner's return of the flash drive.

Dana contends that Turner breached the Employee Agreement by disclosing Dana's confidential test and test parameter information.  The only confidential information that Dana contends Turner used or disclosed was the list of tests and test parameters that were the subject of the emails between Wenstrup and Turner.  (Ex. 220; Ex. 73.)  For the same reasons explained in Part II(A) above, the Court does not find the list of tests and the skeletal descriptions to constitute the disclosure of confidential data.

The evidence is not sufficient to support Dana's breach of contract claim against Turner.  Turner is accordingly entitled to judgment on Dana's breach of contract claim.

### 2.  <u>Adleman</u>

Dana contends that Adleman breached the Acknowledgement by failing to return Dana's information until after Dana filed this lawsuit and the Court ordered him to do so, and by making multiple copies of the information.  Dana presented evidence that Adleman accessed the Dana files in his possession on April 29, May 7, and May 11, 2010.  (Hendricks, Tr. 58; Adleman, Tr. 277-79).  He did not return the files until May 14 and May 20.  (Adleman, Tr. 258.)  Hendricks testified that there is evidence that Adleman plugged two devices into his computer.  Files were put into a "Dana" folder on one device, and into a

"Return to Dana" folder on another device. (Hendricks, Tr. 59-60.) Dana contends that Adleman was making multiple copies of the information on these dates for his own purposes.

Unlike Turner, Adleman did not simply have Dana files on a single flash drive that he could return. Adleman did not have a Dana laptop computer, so during the course of his employment, when he went to out-of-town meetings, he would copy the files he would need and bring them on his personal laptop. (Adleman, Tr. 281.) Davis acknowledged that Dana had no protocol related to, or prohibition against, employees storing Dana information on their personal computers or personal storage devices, or backing up their work computers. (Davis, Tr. 178.) At his exit interview, Adleman said he did not know if he had Dana property that needed to be returned. (Ex. 205.) His answer was not fully truthful because he was well aware that he downloaded information the previous evening and that he had information on his personal computer. However, Davis acknowledged that his answer was sufficient to put Dana on notice that he possessed files to review. Nevertheless, Davis never instructed Adleman on how or when he should return the Dana information, nor did he, or anyone else at Dana, call Adleman as they called Turner, to indicate that his "review and return" process was exceeding what they considered to be a reasonable time period.

Following his resignation from Dana, Adleman accessed some of the zip folders containing his Dana files on April 28, May 7, and May 11. (Hendricks, Tr. 49-55, 56-68.) Adleman testified that he accessed the files as part of his review and return process required by the Acknowledgement Agreement. (Adleman, Tr. 296-98.) He had a box in his office

57

where he placed books and journals to be returned to Dana. (*Id.* at 298.) He also began reviewing files and transferring them to a flash drive. On May 7 he placed some files on a flash drive with the intention of giving them to a Dana employee at a housewarming party, but he left the flash drive in his glovebox. (*Id.* at 299.) He explained that he created new files when he tried to measure how much space the information would take up on a flash drive. (*Id.* at 299-300.) On May 11 Dana filed this action, and on May 20, Dana obtained a preliminary injunction. (Dkt. Nos. 1, 21.) Adleman testified that he returned all of the Dana material in his possession on May 14 and May 20, 2010. Adleman never unzipped any of the Dana folders in his possession and never opened any of the confidential files contained in those zipped folders. (Adleman, Tr. 296-97; Ripa, Tr. 723.) The only file he opened was an Excel spreadsheet that he had downloaded from the Internet. (Adleman, Tr. 297.) Nothing in Hendricks' testimony contradicts Ripa's testimony that Adleman did not open any of the individual confidential files. (Hendricks, Tr. 49-68.)

Adleman's testimony that he had difficulty finding time to sort through the Dana information on his personal laptop and figuring out how to return it during this busy time in his life was credible, and the Court is inclined to believe him. Adleman had been given no direction on when or how the material was to be returned, and his return of documents within three weeks, was consistent with Nowak's understanding of what was reasonable under the circumstances. Dana does not accuse Adleman of breaching the Employee Agreement by using or disclosing Dana's confidential information and there is no evidence that he used or

disclosed any Dana information at American Axle. Furthermore, he showed no bad faith toward Dana at the end of his employment there. He made sure that the engineers he was working with at Dana had the materials they needed to continue the work Adleman had been involved in. (Parent Dep. 10-12; Andres Dep. 11-13; Adleman, Tr. 292.) Adleman's explanation for how the extra files were created is understandable, and his return of everything within three weeks of his resignation was not unreasonable.

Dana has not proved, by a preponderance of the evidence, that Adleman made copies of the Dana information for his own use, or that he failed to return the information promptly. Accordingly, the Court finds in favor of Adleman on the breach of contract claim.

### 3. **Wenstrup**

Dana asserts that Wenstrup breached his Employee Agreement with Dana by consistently disclosing Dana's confidential information to American Axle, including information regarding testing, test parameters, product development, product improvement, gear development, and cost and pricing information.

Defendants contend that Dana waived the contractual provisions in the Employee Agreement and Standards by virtue of its permissive conduct toward Wenstrup's retention of Dana materials at the conclusion of his employment. (Dkt. No. 416, Indvl. Defs.' Post-Tr. Br. 26-27.) While Dana's permissive attitude certainly can be understood as a waiver of any requirement to return or to avoid reviewing documents, it is not a waiver of Wenstrup's agreement not to "disclose or use at any time either during or subsequent to my employment . . . any secret or confidential information of [Dana] which I have acquired during said

59

employment . . . ." (Ex. 191.) However, for the same reasons explained in Part II(A) above, the Court does not find that Wenstrup disclosed or used any secret or confidential information of Dana during his employment at American Axle. Accordingly, all of the Individual Defendants are entitled to judgment on Dana's breach of contract claims.

## C. Tortious Interference and Unfair Competition

Counts 7 and 8 of Dana's amended complaint allege claims for unfair competition and tortious interference. The unfair competition claim is asserted against all defendants, and the tortious interference claim is asserted against only American Axle. Both claims are based on Dana's assertion that Defendants engaged in a concerted effort to improperly compete against Dana in the marketplace by raiding Dana employees and procuring and utilizing Dana's confidential and trade secret information as part of a coordinated plan. (Dkt. No. 387, Dana Post-Tr. Mem. 43.)

The elements of a tortious interference claim are: (1) the existence of a valid relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer: (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted. *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 323 F.3d 396, 404 (6th Cir. 2003). Proof of intentional interference requires showing purposeful or knowing behavior and that the interference was either: (1) a *per se* wrongful act; or (2) a lawful act done with malice and unjustified in law for the purpose of invading the contractual rights or business relationships of another. *Id.* Where a defendant's actions are motivated

by legitimate business reasons its actions do not constitute improper motive or interference. *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597 (Mich. Ct. App. 2003).

Wenstrup had been terminated from his position at Dana approximately nine months before he was hired by American Axle. Accordingly, Dana did not have a valid interest or expectancy in a continued employment relationship with Wenstrup. Wenstrup did not have a covenant not to compete with Dana. Accordingly, Dana did not have a valid interest or expectancy that Wenstrup would not be employed by a competitor such as American Axle. Dana asserts, however, that it had a legitimate and continuing expectancy that Wenstrup would not divulge Dana's confidential information based on Wenstrup's Employee Agreement, which provided that he would not disclose or use Dana's secret or confidential information "at any time either during or subsequent to my employment." (Ex. 191.) This claim fails because the Court finds no evidence to support any attempt by American Axle to induce Wenstrup to breach his confidentiality agreement. The only evidence regarding American Axle's position regarding the use of Dana's information is its direction to Wenstrup that such information could not be used if it was confidential.

Dana also contends that by appointing Wenstrup as the Chief Engineer, and then turning a blind eye to his methodology, American Axle allowed Wenstrup to infuse the entire American Axle commercial vehicle axle group with Dana's material usage, testing protocol, customer data, product cost, customer price strategies, and application techniques. (Dana Post-Tr. Mem. 60.) This claim also fails for lack of evidentiary support. There simply has

been no showing that Wenstrup infused the American Axle commercial group with Dana's trade secrets. If the Court were to accept Dana's argument based on the evidence presented, the Court would essentially be imposing on American Axle a duty to prevent Wenstrup from working in his field of expertise, even though Dana itself never obtained a covenant not to compete from Wenstrup.

Dana did make a prima facie showing that it had a valid relationship with Turner and Adleman,[7] and that American Axle had knowledge of that relationship. However, Dana has not met the third element of its tortious interference claim with respect to these individuals. Dana has not shown that American Axle intentionally interfered with that relationship and induced or caused a breach or termination of that relationship.

The evidence at trial showed that neither Turner nor Adleman was inclined to move to Maumee. They were both looking for alternative employment so that they could stay in the area. Dana HR representative Nowak testified that Dana anticipated that when announced that it was closing its Kalamazoo facilities, it would lose some of the 60 engineers at its Kalamazoo plant, chiefly because of their desire not to relocate to Maumee, Ohio. (Nowak Dep. 11, 41, 112.) Dana was aware that its competitors had been contacting Dana engineers with employment opportunities. (Nowak Dep. 111-12.) Dana specifically understood the risk that engineers might relocate to American Axle's facility in nearby Three

---

[7]As this Court previously noted, the fact that Turner and Adleman had decided that they would not continue to work for Dana after the Kalamazoo office was closed does not necessarily show that Dana did not have a valid business relationship with them. (Dkt. No. 282, 6/29/2012 Op. at 29).

Rivers. (Nowak Dep. 41.) Davis testified that Dana engineers were free to accept employment with other companies, including Dana's competitors, rather than relocate. (Davis, Tr. 235.)

There was also no evidence to suggest that the manner in which American Axle reached out to Turner and Adleman was wrongful *per se* or that it was done maliciously or without legal justification. American Axle learned of Dana's decision to close its Kalamazoo facility during the same time frame that American Axle was looking for engineers with commercial experience to work at Three Rivers on the Mack launch. (Sofia, Tr. 790-91; Orozco, Tr. 843.) Sofia and Orozco assumed, based on what had happened when Dana closed its Fort Wayne facility, that not all of Dana's engineers in Kalamazoo would be offered jobs in Maumee, and others would not want to relocate to Ohio.

American Axle put out a feeler to individuals who might be looking for a job when Dana moved out of the area. There is nothing improper or malicious about requesting or compiling a list of affected Dana engineers, or to attempting to recruit experienced personnel who Dana had already anticipated might leave its employ. None of the individual defendants was bound by a non-competition agreement or covenant not to compete. There is no evidence that American Axle put undue pressure on any Dana employee, or that they enticed anyone to switch jobs by making any improper promises. Davis himself considered moving to American Axle, and testified that when he interviewed with Sofia about a job at American Axle, Sofia did not make any disparaging remarks about Dana, and did not ask Davis to bring

Dana information to American Axle . (Davis, Tr. 233, 236.) Dana has not identified anything about American Axle's conduct that suggests an illegitimate attempt to gain an unfair competitive advantage.

American Axle hired Wenstrup, Turner and Adleman to fill specific needs for personnel within its commercial vehicle business unit. Their recruitment of engineers who were knowledgeable in the field of commercial axles was motivated by legitimate business reasons. At the time Dana announced that it was closing its Kalamazoo facility, there were 50-60 engineers at the Kalamazoo facility. Almost half of the engineers employed by Dana at its Kalamazoo facility left Dana rather than relocate to Maumee, Ohio. (Davis, Tr. 234; Nowak, Tr. 114.) American Axle interviewed only three, and hired only two of them. The evidence simply does not support Dana's assertion that American Axle conducted an orchestrated raid of its engineers.

Turner and Adleman downloaded information that would be beneficial to American Axle immediately before resigning from Dana. Based on the quantity and the nature of the information downloaded by Turner and Adleman, the coincidences regarding dates of copying and interviews, and their lack of candor at their exit interviews, Dana's suspicions regarding their intentions was reasonable. However, the evidence produced at trial did not support Dana's suspicions.

The fact that Turner and Adleman copied their work files before departing their employment does not create an inference that they did so in an attempt to steal confidential

information from Dana or to bring that information to American Axle.  Copying work files

at the conclusion of employment does not, in and of itself, support an inference of suspect

behavior.  As evidenced by the testimony of Wenstrup and Gerlach, and by Dana's IT

department's offer to copy hard drives for departing employees, it is not unusual for

employees to want to take evidence of their work when they leave their employment.  Turner

and Adleman's copying and removal of Dana information may not have been appropriate,

but it does not support an inference that American Axle encouraged them to take the files or

that they intended to share the information with American Axles or others.

Turner and Adleman  were credible witnesses.  At most, Dana showed that some of

the information downloaded by the individual defendants could have been useful to

American Axle  and harmful to Dana.  But Dana failed to show that any of the information

downloaded by Turner and Adleman was solicited by American Axle, disclosed to American

Axle, or used by American Axle.  There is no evidence that American Axle even knew that

Turner and Adleman had downloaded information before this suit was filed.  The Court

simply finds no evidence that anyone at American Axle encouraged Turner and Adleman to

steal Dana information, or otherwise targeted Turner and Adleman so that they would bring

confidential Dana information to American Axle.  Accordingly, the Court finds in favor of

American Axle on Dana's tortious interference claim.

As noted above, Dana's unfair competition claim against all of the Defendants is

based on the same allegations.  "[U]nfair competition 'prohibits unfair and unethical trade

practices that are harmful to one's competitors or to the general public.'" *Consol. Rail Corp. v. Grand Trunk W. R.R.Co.*, No. 09-10179, 2009 WL 3460334, at *14 (E.D. Mich. Oct. 22, 2009) (quoting *ATCO Indus., Ins. v. Sentek Corp.*, Nos. 232055 & 235398, 2003 WL 21582962, at *3 (Mich. Ct. App. July 10, 2003). "'The term unfair competition may encompass *any conduct* that is fraudulent or deceptive and tends to mislead the public.'" *Id.* (quoting *ATCO*, 2003 WL 21582962, at *3). Each unfair competition case "is determined upon its own facts and relief is based upon the principles of common business integrity." *Good Housekeeping Shop v. Smitter*, 236 N.W. 872, 873 (Mich. 1931). In *ATCO Industries,* the court found that Sentek's hiring of some of ATCO's former employees and obtaining a workforce familiar with their job, which resulted in savings to Sentek, was not unfair competition where the employees were not under contract with ATCO and were free to seek other employment. 2003 WL 21582962 at *4.

The evidence admitted at trial does not support Dana's theory that American Axle raided Dana's employees or that it conspired to obtain Dana information in order to unfairly compete against or to harm Dana. The evidence shows nothing more than that American Axle hired available engineers at a time when it had positions open in its commercial vehicle unit. Just as there was a lack of evidence to support a tortious interference claim, there is also a lack of evidence to support an unfair competition claim against any of the defendants.

## D. Damages

Dana contends that Defendants' wrongful conduct resulted in at least $6 million in damages to Dana, which should be allocated 90% to American Axle, 5% to Wenstrup, 2.5%

to Turner, and 2.5% to Adleman.  Dana also contends that an award of punitive damages and attorneys' fees is warranted.  Dana also seeks entry of a permanent injunction.

Because the Court has determined that Plaintiff has not shown that Defendants are liable on any of Plaintiff's claims, the Court need not address the issue of damages. However, even if Dana had established liability on any of its claims, Defendants would still be entitled to judgment in their favor because Dana has failed to present evidence that it has suffered any damages as a proximate result of any defendant's conduct under any of its theories of liability or that it needs injunctive relief.

Dana presented only two damages witnesses: Davis, and Dana's retained expert, Thomas Frazee.  Frazee's expert report and trial testimony related solely to alleged damages incurred by Dana as a result of claimed misappropriation of trade secrets.  To the extent Davis discussed damages, his testimony was similarly limited to the misappropriation claim. Dana presented no evidence as to any damages associated with its claims for breach of contract, tortious interference, or unfair competition.  For purposes of this discussion, however, the Court will assume that the same method for calculating damages under the MUTSA could also be an acceptable way to measure damages under Dana's other claims.

The MUTSA allows for damages as follows:

Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.  In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

Mich. Comp. Laws § 445.1904.

The Sixth Circuit has recognized that damages in trade secrets cases are often difficult to calculate. *See Mid-Michigan Computer Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510 (6th Cir. 2005) (quoting *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 485 (6th Cir. 2002)). Nevertheless, there are recognized principles that apply to the calculation of damages:

> When the misappropriated trade secret is used to field competing products, the best measure of damages is the plaintiff's lost profits or the defendant's illicit gains. However, where the misappropriated secrets were not directly used to field competing products, but were used, for example, to save research and manufacturing resources, plaintiffs have used a number of different methods of calculation to determine damages.

*Id.* (quoting *Avery Dennison*, 45 F. App'x at 485). "Where a trade secret has not been destroyed and where the plaintiff is unable to prove specific injury, courts measure the value of the secret to the defendant." *Avery Dennison*, 45 F. App'x at 486 (citing *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535-36 (5th Cir. 1974)). The value of the secret to the defendant may be "based on the value to the defendant of the secret at the time of misappropriation, the value derived from savings because of increased productivity, or the value derived from savings in research costs." *Id.* (citing *Univ. Computing*, 504 F.2d at 535-36).

Frazee testified that for purposes of measuring damages in this case, he was unable to apply the lost profits or the illicit gains approach because he lacked evidence to support those methodologies. (Frazee, Tr. 591-92.) He was not aware of any contracts or customers

68

lost or gained as a result of American Axle's alleged use of Dana's trade secrets. (Frazee, Tr. 640-41.) Frazee also testified that he could not apply the reasonable royalty approach because he lacked the relevant evidence. (Frazee, Tr. 592, 640.) Frazee ultimately selected "a methodology that is focused on the value of the information that was utilized by the defendants." (Frazee, Tr. 593.) He identified his test as the cost avoidance test. (Frazee, Tr. 641.)

In applying the cost avoidance test, Frazee considered what Dana expended in order to develop those trade secrets, and then determined what percentage of those costs inured to the benefit of American Axle by the use of the information. (Frazee, Tr. 593, 612.) His five-step analysis involved the following determinations: (1) the amount Dana spent to create deliverables; (2) the proportion of those deliverables that have potential value to American Axle if used; (3) the types of information American Axle is alleged to have used; (4) the context of that use; and (5) what proportion of Dana's spend has a value to American Axle. (Frazee, Tr. 619-20.) Frazee ultimately concluded that Dana expended $30 million over a four-year period to develop commercial drive axle "deliverables," and that 20% of that expense, or $6 million, benefitted American Axle. (Frazee, Tr. 595, 599, 616, 622-24.)

Under Frazee's methodology, the value of the information to Defendants depended on Defendants' use of the information. As Frazee testified, in applying the cost avoidance methodology, a relevant consideration was what information was used by the defendants. (Frazee, Tr. 641-42.) "The value of that information is a measure of the cost that American

Axle avoided by instead using that information. Instead of developing itself, it used it. The value of that used information was the measure of damage." (Frazee, Tr. 593.) Although Frazee subsequently testified that use was not a necessary or critical requirement (Frazee, Tr. 643), his testimony was not credible in light of his prior testimony focusing on use.

Dana contends that it is not required to show use because courts look to "the value of the secret to the defendant at the time that it was misappropriated, regardless of the commercial success of the enterprise." *Avery Dennison*, 45 F. App'x at 487. The language Dana relies on does not refute the need to show use. It merely provides that under the reasonable royalty approach, an approach admittedly not used by Frazee, the use does not have to result in profit. In *University Computing*, the case relied on in *Avery Dennison*, the court specifically required use, even under the reasonable royalty measure of damages. As that court noted, "the defendant must have actually put the trade secret to some commercial use." *Univ. Computing*, 504 F.2d at 539. "The law governing protection of trade secrets essentially is designed to regulate unfair business competition, and is not a substitute for criminal laws against theft or other civil remedies for conversion." *Id.*

Dana has not suggested how cost avoidance can be established in the absence of use. Cost avoidance necessarily contemplates use. Nevertheless, in arriving at his damages calculation, Frazee did not consider what information was actually used by American Axle. He simply assumed that all of the proofs offered by Dana were examples of confidential or trade secret information utilized by a defendant. (Frazee, Tr. 655.) In other words, he

assumed that American Axle used all of the computer files copied by Turner, Adleman, and Wenstrup. This Court determined, in Part I above that Defendant Wenstrup only accessed ten Dana documents, and that none of Dana's confidential information was disclosed or used. Because Dana has not persuaded the Court that American Axle used any of Dana's trade secrets, Dana has failed to show that American Axle avoided any costs.

Moreover, even if Defendants had disclosed or used **some** of Dana's trade secrets, that would not save Frazee's calculations because his assumption that **all** of the information was used affected every step of his analysis, from what Dana spent to create deliverables, to the proportion of those deliverables that had value to American Axle. As Frazee testified, in concluding that 20% of the deliverables had value to American Axle, he "considered the fact that the degree of usage or the types of information that was being allegedly used was different for each of those different departments, and so it's not a uniform 20 percent for each department." (Frazee, Tr. 616.) Because Frazee did not consider what documents were used, his damages calculation is speculative and is not supported by the evidence. Dana did not produce evidence to support its contention that American Axle avoided costs, benefitted from, or was unjustly enriched by Dana's confidential or trade secret information.

Neither has Dana shown that it is entitled to injunctive relief. The MUTSA provides that "[a]ctual or threatened misappropriation may be enjoined." Mich. Comp. Laws § 445.1903(1). Injunctive relief is not appropriate in this case because Dana has not proved that Defendants used Dana's confidential information or that they failed to return any of

Dana's confidential information.  *See Mich. One Funding, LLC v. MacLean*, No. 303799, 2012 WL 4210424, at *3 (Mich. Ct. App. Sept. 20, 2012) ("Because defendant returned PrimeOne's property and had it permanently deleted from his home computers and electronic storage devices, there was no risk of real and imminent danger to plaintiffs. Thus, permanent injunctive relief would not have been appropriate.")  Furthermore, the individual defendants are all still bound by their Employee Agreements not to use or disclose Dana's confidential information.

### III. CONCLUSION

Based on the copying of substantial Dana confidential information by employees who were leaving to work for a competitor, Dana's concerns about the misuse of confidential information were justified.  However, after engaging in exhaustive discovery and strenuously litigating this case, Dana has not managed to support its suspicions with concrete evidence. Dana's voluminous exhibits do not support the conclusions Dana requests the Court to draw. Despite Dana's continual assurances that it would link the Defendants to the violations alleged, Dana failed to do so.  At the end of the case, after careful and thoughtful reflection, the Court concludes that Dana has not come close to preponderating on any of its claims. The Court will accordingly enter a judgment of no cause of action on all of Dana's claims in favor of all of the Defendants.

An order and judgment consistent with this opinion will be entered.


Dated: <u>August 19, 2013</u>              <u>/s/ Robert Holmes Bell</u>
                                          ROBERT HOLMES BELL
                                          UNITED STATES DISTRICT JUDGE